**PAUL HARDEMAN, INC., Plaintiff,**

v.

**ARKANSAS POWER & LIGHT COMPANY, a corporation, Defendant,**

**The Aetna Casualty & Surety Company, Additional Counterclaim Defendant.**

**No. LR–65–C–66.**

United States District Court, E. D. Arkansas, W. D.

June 3, 1974.

As Amended June 14, 1974.

**300**

E. L. McHaney, Owens, McHaney & McHaney, Little Rock, Ark., for plaintiff.

E. B. Dillon, Jr., House, Holmes & Jewell, Little Rock, Ark., for Ark. Power & Light Co.

Bill S. Clark, Smith, Williams, Friday, Eldredge & Clark, Little Rock, Ark., for Aetna.

## MEMORANDUM OPINION

EISELE, District Judge.

*Background of Controversies* *

Around 1960 the officials of a group of electric utility companies operating in some six states began looking into the possibility of a diversity interchange between the Tennessee Valley Authority (TVA) and those utility companies. It was thought that this could be carried out through the construction of a network of extra-high voltage transmission lines (EHV) connecting the TVA system with the systems of the utility companies. Studies had indicated that the costs of the EHV facilities were sufficiently lower than the costs of creating an equivalent amount of new generating capacity to suggest that the diversity interchange was the better approach.

On August 8, 1962, eleven electric utility companies, identifying themselves as the South Central Electrical Companies (SCEC), entered into an agreement with Commonwealth Associates, Inc. (CAI) of Jackson, Michigan, to assist in the planning of the proposed facilities. In performing such duties CAI conducted a study of an 1,100-mile grid of EHV transmission lines. Subsequently, the SCEC companies decided to build the grid, and the defendant, Arkansas Power & Light Company (AP&L), procured the services of CAI to design the portions thereof in which it was interested, to receive and evaluate bid proposals, to recommend the contractor to be employed, and to assist in the letting of the various contracts which would be required. CAI was also employed to provide the engineering and inspection services which would be needed during the construction.

---

\* Regardless of captions, both findings of fact and conclusions of law will be found throughout this opinion.

This lawsuit arises out of the circumstances attending the bidding for, and work on, the first segment of the SCEC grid, which was to run from the Mississippi River to Mabelvale, Arkansas, approximately 139 miles, exclusive of river crossings.

On March 7, 1964, CAI forwarded bid documents to some 16 prospective bidders, including the plaintiff, Paul Hardeman, Inc. (PHI), with instructions that sealed bids should be submitted on or before March 23, 1964. The bids were for the construction of a single circuit, 500 KV electrical transmission line from the Mississippi River near West Memphis, Arkansas, to Mabelvale (near Little Rock), Arkansas. The bid proposal divided the work into 176 items, or units of work. The bid would show a price for each item or each unit of work. The quantity of each unit or item of work was estimated. The bid proposal contained the following provision:

"Enclosed herewith is a Bid Bond in the amount of $300,000, which is submitted as a guaranty of the good faith of the bidder and that bidder will enter into a written Contract, in the form of the Agreement bound with the Specifications, to do the work should the award be made to him; and it is hereby agreed that if, at any time, other than as provided in the Proposal, the undersigned shall withdraw his Proposal, or shall fail to execute the Contract and furnish satisfactory Bond, as herein provided, the Owner, in either of such events, shall be entitled and is hereby given the right to retain the Bid Bond, Cashier's Check, or Certified Check (strike those not applicable) as liquidated damages. If award is not made to the undersigned bidder, then the enclosed Bid Bond, Cashier's Check, or Certified Check (strike those not applicable) shall be returned by the Owner to the Bidder in accordance with the Instructions to Bidders."

In response to the invitation, the plaintiff and seven other contractors submitted bids for the performance of the construction work.

The original bid proposals were sent to CAI at its Jackson, Michigan office, and copies thereof were sent to AP&L at its offices in Pine Bluff, Arkansas. The bids were opened in private, and the amounts of the bids were not publicized or otherwise made known to the bidders.

Eight bids were received, on or about March 23, 1964, as follows:

| | |
|---|---|
| Paul Hardeman, Inc.<br>Stanton, California | $2,704,738.00 |
| R. B. Stovall Construction Company<br>Dallas, Texas | $3,809,911.26 |
| Foley-Jelco<br>Salt Lake City, Utah | $3,840,276.50 |
| Commonwealth Electric Company<br>Lincoln, Nebraska | $4,528,593.00 |
| L. E. Myers Company<br>Chicago, Illinois | $5,515,967.15 |
| R. H. Bouligny<br>Charlotte, North Carolina | $5,997,710.00 |
| Power Constructors, Inc. &<br>Power Engineering Company<br>Topeka, Kansas and<br>Sioux City, Iowa | $7,514,131.00 |
| T. D. Bross Line Construction<br>Company, Hartford, Connecticut | $7,773,143.00 |

These bids vary from a low of $18,826.00 per mile (the bid of PHI) to $53,129.00 per mile.

On March 26, 1964, PHI was informed by telephone that it would be awarded the contract. A confirming letter was mailed on March 26, 1964, and the acceptance of PHI noted thereon on March 30, 1964. A formal contract was executed by the parties on April 1, 1964, showing a total contract price, based upon estimated quantities, of $2,704,738.00. A construction bond in the amount of $2,705,000.00 was issued by the Aetna Casualty and Surety Company (Aetna).

In the early part of April, 1964, PHI commenced activities in connection with the performance of the work required.

The contract contains the following provision:

"If the work to be done under this Contract shall be abandoned by the Contractor, or if this Contract shall be

assigned, or the work sublet by him without the permission of the Owner, or if he be placed in bankruptcy, or if a Receiver be appointed for his properties, or he shall make an assignment for the benefit of creditors, or if at any time the Engineer shall be of the opinion that the schedule of work is not being maintained or that the Contractor is violating any of the conditions or agreements of this Contract, or is executing said Contract in bad faith or not in accordance with the terms thereof, the Owner may notify the Contractor to discontinue all work under this Contract by written notice to be served upon the Contractor, a copy of which notice shall be given to the Surety may, at its option, assume the date of such notice, the Contractor shall discontinue the work, whereupon the Surety may, at its option, assume this Contract and proceed to perform the same. The Surety, in such event, shall take the Contractor's place in all respects and shall be paid by the Owner for all work performed by the Surety in accordance with the terms of this Contract. In case the Surety does not, within two weeks after the date of the Owner's notice to the Contractor to discontinue work, exercise its right or option to assume this Contract, then the Owner shall have the power to complete the work herein described by contract or otherwise, as it may determine, and the Contractor agrees that the Owner shall have the right to take possession of and use any of the materials, plant, tools, equipment, supplies, and property of any and every kind provided by the Contractor, and the expense so charged shall be deducted by the Owner out of such moneys as may be due or may at any time thereafter become due to the Contractor. In case such expense is more than the sum which would otherwise have been payable under the Contract, then the Contractor shall pay the amount of such excess so due. The Owner shall not be required to obtain the lowest figures for the work of completing the contract, but may make such expenditures as in its sole judgment shall best accomplish such completion."

In late November, 1964, AP&L received a letter from 'CAI, the first paragraph of which states:

"Commonwealth Associates, Inc., as the Engineer referred to in Article 27 of the General Conditions in your contract with Paul Hardeman, Inc. for construction of a 500 KV Transmission Line, is of the opinion that the schedule of work set forth therein is not being maintained, that many of the conditions and agreements of this Contract are being violated, and that the Contract is not being executed in accordance with the terms thereof."

On November 28, 1964, AP&L wrote PHI the following letter:

"Pursuant to paragraph numbered 27 of the General Conditions which constitute a part of that certain contract between the undersigned and you dated March 30, 1964, for the construction of the Mississippi River-West Memphis-Mabelvale Single-Circuit 500 KV Transmission Line, we hereby notify you to discontinue all work under the said contract. This notice is given as a result of the opinions of Commonwealth Associates, Inc., the Engineer designated in the contract. The Engineer is of the opinion that the schedule of work is not being maintained and at the present rate of progress the work will not be completed within the contract time; that you have been and are violating many of the conditions and agreements of the Contract and Contract documents; and that you are not executing the Contract in accordance with the terms of the Contract. A copy of the letter of the Engineer expressing these opinions is attached.

"You are hereby directed to deliver to this company all of the materials, plant, tools, equipment, supplies and property of any and every kind which have been provided by you for the

purpose of the work under the afore-described Contract so that the same may be used in the completion of the work. In addition, you are directed to deliver to us all material provided for us and received by you for incorporation in this work."

PHI responded with the following telegram, dated December 1, 1964:

"Receipt is acknowledged of your November 28, 1964 letter and its enclosure and acknowledgment is made of a telephone conversation this date with Floyd W. Lewis while he was at the New York Hilton Hotel. During the telephone conversation Mr. Lewis reiterated the demand that Paul Hardeman, Inc. remove its forces from the job sight [sic] and stop any further performance on the project. He further indicated his acceptance of the opinion of Commonwealth Associates as set forth in the November 25, 1964 Commonwealth letter to Arkansas Power & Light. Paul Hardeman, Inc., under protest, is proceeding to withdraw its forces from the project. We except to the representations by way of opinion in the Commonwealth letter and we advise you that your instruction to withdraw our forces is unwarranted and not supportable by facts. In acceding to your direction to withdraw we do so with the reservation of all rights and defenses available to Paul Hardeman, Inc., including but not limited to the right for compensation for work done to date, demobilization costs and the matters mentioned in the Paul Hardeman, Inc. letter to Arkansas Power & Light dated November 16, 1964, which letter you have continued to ignore and fail to answer. A copy of this message is being transmitted to Aetna Casualty and Surety Company."

The Aetna Casualty and Surety Company was also given notice. Under the agreement and bond Aetna had the right to take over and complete the construction of the transmission line, if it elected to do so, within two weeks of the notice to discontinue given to PHI. Aetna elected not to take over and complete the work pursuant to this provision. By the time PHI received the notice to discontinue work, it had received $628,427.66 from AP&L for work performed under the contract.

On December 15, 1964, AP&L contracted with Jelco, Inc. to complete the work. The basic Jelco contract was based on cost plus 10 per cent. The work was substantially completed in the summer of 1965 at a cost, according to the records of AP&L, of $8,237,056.59. Plaintiff PHI's records indicate that it expended, or obligated itself for, some $3,054,166.32 prior to moving off the job. It is therefore apparent that the job, which was originally bid by PHI at approximately $2,700,000.00, ended up costing in excess of $11,000,000.00. The explanations for this financial and economic nightmare can be found from a more detailed discussion of the facts relating to the legal controversies. *See infra.*

It has been stipulated that Aetna expended $610,126.71 in payment of suppliers of labor and material for the job. This amount is included in the $3,054,166.32 as the cost of work and materials performed by, and under, PHI prior to the termination of the contract.

By virtue of its claims discussed below, PHI seeks judgment against AP&L in the amount of $1,815,610.95, and Aetna seeks judgment against AP&L in the amount of $610,127.71; both with interest at the rate of six per cent from and after November 28, 1964. AP&L counterclaims, seeking judgment against PHI in the amount of $5,875,173.15. It also seeks judgment against Aetna in the amount of the bond ($2,705,000.00) less payments made by Aetna in the amount of $610,127.71, or a net of $2,094,873.29.

The complaint of PHI and the claim of Aetna are predicated upon essentially the same allegations and the same facts. Each asks for relief against the defendant AP&L on the basis of two separate

claims. The "first claim" is based upon theories of mistake, misrepresentation, fraud or constructive fraud, implied contract, and the "inequitable" conduct of the defendant in the award of the contract. The "second claim" of PHI and Aetna is based upon the theory that the defendant had no right to "discontinue all work" under the contract or to terminate or repudiate the contract as it purported to do by its letter to PHI of November 28, 1964; that such discontinuance or termination was wrongful and was itself a breach of the contract for which PHI and Aetna are entitled to damages. AP&L has counterclaimed against PHI and has also complained against Aetna, contending that PHI committed breaches of contract and that PHI's conduct constituted "total breaches" of the contract and that therefore PHI is liable to it for the cost of the completion of the project. Based upon the same theory, it seeks judgment against Aetna for the balance remaining upon its bond.

The issue relating to the plaintiff's and Aetna's "first claim" against the defendant will be discussed first and thereafter the "breach of contract" claims.

### The "First Claim" of PHI and Aetna

The gravamen of this claim is the alleged inducement of PHI by the defendant to enter a contract for a price that was known by the defendant (but unknown by PHI) to be shockingly inadequate and unfair; and plaintiff contends that defendant accomplished this objective not only by concealing information but by the giving of false or misleading information in response to PHI's inquiries about the bids. In support of such allegations plaintiff attempted to prove that the defendant knew that there was something grossly wrong with the plaintiff's bid, not only because of its relationship to the other bids received, but also because the defendant and its consultants had, prior to the acceptance of the bid, fairly precise estimates, data, and information as to the cost of the contract work (with which to compare and evaluate plaintiff's bid) which indicated that the cost should be in the neighborhood of $35,000 a mile as contrasted with the cost of $18,826 per mile reflected in the plaintiff's bid. Plaintiff contends that with such information in hand the defendant should have made inquiry of the plaintiff concerning the bid and that, if such an inquiry had been made, plaintiff would, upon reevaluation, have discovered its "gross" errors in estimating the job, and would either have submitted a new bid or withdrawn its bid, forfeiting some $300,000 pursuant to the terms of the bidding agreements.

Since the facts relating to the "first claim" also affect, albeit indirectly, the other issues in the case, it will be necessary to discuss them briefly. Many of those facts are uncontested.

The spread of the bids, noted above, is, of course, admitted by all. The testimony of practically everybody concerned was to the effect, and the Court so finds, that the two high bids were essentially "courtesy" bids which should have been, and were, ignored, since they could not be said to have been submitted in any serious hope or expectation of getting the job. There was also testimony, and the Court so finds, that the second low bid (that of Stovall) would also have to be ignored because that company was an open-shop contractor and therefore could not be accepted by AP&L. This, therefore, leaves five bids which were considered to have been submitted with serious intent.

There was much controversy and much testimony concerning the issue of whether AP&L had information, estimates and data (other than the bids) from which it knew, or should have known, that PHI's bid was grossly inadequate and based upon mistake or error. Generally, the defendant throughout the trial denied that it had any reliable information, data or estimates upon which to predicate such a judgment. The Court, however, finds to the contrary,

and agrees with plaintiff that both AP&L and CAI had, prior to the acceptance of plaintiff's bid, a satisfactory and sufficiently accurate basis for evaluating and comparing plaintiff's bid and all other bids received. This basis of comparison is derived not only from the so-called R–943 estimate (Exhibit 30) but also from feasibility studies, cost analyses and estimates, experience on other projects, information about other projects, professional knowledge and expertise, familiarity with then current labor, equipment and material costs, awareness of construction techniques, procedures and know-how, extensive knowledge as to the conditions imposed by the particular terrain to be traversed, general knowledge of access conditions and problems, familiarity with weather and soil conditions, and, of course, a full awareness of the detailed plans, specifications and other contract and bid requirements. To say less would be to suggest that either AP&L or CAI, or both, were incompetent to engage in the very business which they carried on. To the contrary, both were professionally competent to function in this important area which, of necessity, closely affects the public interest. They should have had, and they did have, adequate information upon which to intelligently evaluate and compare the bids, and they did utilize that information for those very purposes. More specifically, the Court finds that AP&L and CAI estimated and expected the line construction costs to roughly approximate $35,000 per mile. The Court bases this finding upon the evidence and the reasonable inferences arising from that evidence. Indeed, it was on the basis of this estimate and the other information available to them that AP&L and CAI were able to determine that the two high bids were essentially "courtesy bids". Such determinations cannot be made without some reasonably reliable benchmark. In this connection it should be noted that the spread between the sixth bid and the two high bids was not too much greater than the spread between PHI's bid and the Foley-Jelco bid.

It is quite clear that the officials of AP&L and CAI were very surprised by the PHI bid. An analysis of the nature of the contract and the relationship of the bids will explain their surprise.

The contract involved in this litigation was essentially a labor and construction equipment contract. The owner (AP&L) was to supply practically all of the material which would end up as the transmission line in place, e. g., the steel for the towers and the conductor and ground wire. By "construction equipment" the Court is referring to that equipment which is used in the construction process but does not become incorporated into the end product. The contract itself is frequently referred to as the "line contract" or the "line construction contract".

When the bids were opened, it is clear that the CAI people were concerned about the PHI bid, particularly with respect to those items comprising "towers in place", that is, generally, the "civil" portion of the contract. Although the construction of a 500 KV transmission line was new in the industry, at the time, the "newness" was principally related to the "stringing" portions of the contract and not to the "civil" construction aspects. The latter, relating as it does to the construction of foundations and the erection of steel towers, involved construction methods and techniques with which the industry as a whole had had much experience over many years. When the bids were compared with each other and with the estimating figures being used by CAI and AP&L, the attention of CAI and AP&L was immediately drawn to the "towers in place" portion since the "stringing" portion of the PHI bid was more in line with competing bids. If one separates out and compares the "towers in place" portions of the various bids, he finds:

| | |
|---|---|
| Hardeman | $1,484,534.00 |
| Stovall | 2,466,655.50 |
| Foley-Jelco | 2,822,471.00 |
| Commonwealth Electric | 2,695,183.00 |
| L. E. Myers | 3,575,286.85 |
| Bouligny | 4,324,230.00 |
| Power Constructors | 4,301,739.00 |
| Bross | 3,988,967.00 |

The difference between the PHI *total* bid and the Foley-Jelco total bid (the next higher potentially acceptable bid) comes to $1,135,538.50. If one looks only at the "towers in place" portions of those two bids, he finds the difference to be $1,337,937.00.[1] Certainly the representatives of CAI and AP&L had to be startled when they made this comparison, particularly when they considered that the next three higher bids above the PHI bid contained figures for the "towers in place" portion of the contract which were all relatively close together. There was only one conclusion: that PHI had drastically underbid this portion of the work or that the next three bidders had drastically overstated the cost of such work. With their own opinions as to the cost of such work in mind, they had to conclude, and did conclude, that PHI was probably far off the mark.

Of course, the people at AP&L were very pleased, in fact elated, with the lowness of the bid. The officials of CAI, including Mr. Denbrock, Mr. Sanford and Mr. Enger, were, however, as indicated, seriously concerned about the PHI bid. They wanted to look into it to determine if it was in fact a good bid. The Court is convinced that, if the people at CAI had had their way, there would have been a full and frank discussion of the PHI bid with the officials of PHI, including, probably, some revelation of parts or all of certain competing bids. The people at AP&L, however, did not wish to follow this procedure. It was their company's policy not to reveal the contents of competing bids

in a situation like this. Furthermore, the officials of AP&L did not want to do anything which would jeopardize their chance to take advantage of the low bid. Denbrock and Sanford of CAI initially were of the opinion that the job should not be awarded to PHI. They favored making the award to Foley-Jelco, the next lowest qualified bidder (since Stovall, the second low bidder, was nonunion and could not be considered). Mr. Sanford even revised a cash-flow chart between the time the bids came in and the date of the acceptance of the PHI bid, using the Foley-Jelco bid figures.

The Court finds that the officials of CAI believed that plaintiff's bid was grossly low; were very skeptical of its validity; doubted that PHI had the experience and know-how required; and desired a contractor they knew more about and one that had had more line construction experience.

The final decision to accept the PHI bid was made by the officials of AP&L after they had investigated PHI's financial responsibility.

The plaintiff contends that under the above circumstances the normal and accepted practice in the industry would have required that AP&L reject the PHI bid or warn it in some manner that its bid was suspect. The testimony in this case convinces the Court that there are certain rough industry-wide standards with respect to the degree of disparity between bids, and between particular bids and the owner's own estimates of costs, which are used to check out the reliability of particular bids, to deter-

---

1. There was no suggestion in the testimony that PHI was submitting an "unbalanced" bid or that AP&L and CAI thought that they were.

"Unbalanced bids" are sometimes used by contractors for the purpose of concealing their decisions about particular bid units and also for the purpose of obtaining the bulk of "progress payments" early-on during the performance of the contract. When a contractor uses this device, he carefully analyzes the total bid figure to be certain that it is correct, but then he allocates that total

price in such a manner as will conceal the actual estimated figures on the various subunits of the bid, usually placing the bulk of the cost on those items of work that he expects to conclude early in the contract. It would have been hazardous for any contractor to use that procedure here if he wished to be seriously considered since he knew that AP&L did not have to accept the low bid and that it might make judgments with respect to the ability and expertise of the bidder upon the basis of a careful evaluation and comparison of the subunits in the bid.

mine if "something is wrong" with particular bids or portions thereof, and as an aid in deciding whether to make further inquiry before accepting a bid. There is no precision in this industry-wide practice, but with respect to contracts of the type and magnitude involved in this litigation, it is clear that, when the disparity, or spread, between the low and the next low bid is as high as ten per cent, or where the spread between the bid under consideration and the owner's own estimate exceeds ten per cent, a "red flag goes up" and the situation then calls for careful study and, if such study does not satisfactorily reveal the reasons for the disparity, then inquiry into the possibility of error. This was in fact, as indicated above, the first response of the CAI personnel to the Hardeman bid. It is obvious that they would have liked very much to get the matter out into the open or, if not, then simply to reject the PHI bid in favor of Foley-Jelco. AP&L, on the other hand, wanted the advantage of an obviously extremely favorable bid if it could convince itself that the bidder had the financial resources to complete the project even if the actual cost thereof equalled the Foley-Jelco bid or AP&L's own idea of what the project should cost. They were not content to open this matter up and thereby run the risk of PHI withdrawing from the contract, even though PHI probably would under such circumstances be liable for the amount of the bid bond, $300,000. To save more than $1,100,000 was obviously, to their way of thinking, preferable to obtaining what might be referred to as a windfall of $300,000. Stated otherwise, AP&L had every reason to doubt that PHI could perform the contract at its bid figure. In fact, it had no expectation that PHI could so perform. It was for this very reason that it concerned itself not with finding out what was wrong with the bid but, rather, with finding out if PHI had the financial resources to complete the "contract" at a substantial loss. The officials of AP&L did not feel they were doing anything wrong or unfair in taking this approach.

PHI and Aetna not only contend that AP&L knew, or should have known, that PHI's bid was so low that it could only have been based upon error or miscalculation (and therefore that AP&L was obligated to bring the matter to PHI's attention before accepting the bid); they also contend that the agents of AP&L made affirmatively misleading statements to induce PHI to enter into the contract or to stay with its contract. This latter contention is based upon evidence that Mr. Pond of AP&L responded to a question from a PHI representative concerning the position or status of PHI's bid with the statements, "You are very competitive," or "You had a sharp pencil." These, or similar remarks were made at meetings on March 25, 1964 and April 2, 1964. ~~April 2, 1964.~~ It is important at this point to state the background and circumstances of these two meetings.

AP&L requested PHI to send representatives to Pine Bluff, Arkansas, to meet with officials of AP&L and CAI on March 25, 1964, in what might be called a "pre-award" conference. Mr. Patrick R. Black and Mr. S. M. Rivers attended the meeting on behalf of PHI. Mr. Black, the executive vice-president and second in command of PHI, had had little to do with this particular project prior to March 24, 1964. However, he happened to be in New Orleans on that date and was contacted there by his California office and asked to meet Mr. Rivers in Little Rock that evening and then proceed to Pine Bluff for the meeting on March 25. Mr. Black went to Little Rock and met Mr. Rivers, who had come in from Los Angeles. He went over the contract and bid proposals. Mr. Rivers, who was one of the principal estimators along with Mr. Valentin, left the impression with Mr. Black that the PHI bid included a good profit margin. All in all, Mr. Black entered the conference on March 25 under the impression that PHI had submitted a good bid and would be very lucky if it got the job.

At the meeting on March 25, 1964 there were present, in addition to Mr. Black and Mr. Rivers, two representatives from AP&L, Mr. Lloyd Pond and Mr. J. D. Phillips, and one representative from CAI, Mr. F. A. Denbrock. The meeting lasted approximately two hours. Under the terms of the bid documents, AP&L was not required to accept the low bid. The first item discussed was with respect to the correction of two offsetting, relatively minor mathematical errors which resulted in increasing the bid by approximately $1,500. Mr. Black was informed that AP&L had found the errors and asked if he objected to the correction. He did not object and the correction was made. The parties then discussed various other items, including PHI's general capability of performing the job; the qualifications of certain personnel; the date PHI could start work; critical time factors; the ability of PHI to furnish a performance bond; the subcontractors which PHI contemplated using; the type of equipment PHI would use for wire stringing; and other such matters. During a discussion of the unit cost of wire stringing, someone representing AP&L, or CAI, stated that PHI's bid on this part of the contract was "not low".

Near the end of the meeting Mr. Black requested that he be informed as to the amounts of the other bids and was told that it was AP&L's policy not to disclose the other bidders or the amounts of their bids. Mr. Black then specifically inquired as to the relative standing of PHI's bid. He wanted to know "how low" it was. In response he was told that PHI "had a good competitive bid" and "had a sharp pencil". Mr. Black was asked whether PHI would accept the contract in the form in which it was submitted, to which he replied that there would be "no problem". He was asked if he was satisfied with PHI's bid and answered in the affirmative. Throughout the meeting Mr. Black was attempting to "sell" AP&L on PHI.

The other meeting was the "pre-construction meeting" on April 2, 1964, which was held in the offices of CAI in Little Rock. Among those present were Mr. Pond and Mr. Phillips of AP&L, Mr. Denbrock and Mr. Sanford of CAI, and Mr. Otjen, Mr. Rosenbaum and Mr. Valentin for PHI. At this meeting the parties discussed the methods to be used in construction; the right-of-way; the equipment to be used in construction and its condition; the starting point for the construction work; and the problems relating to the unloading and storage of steel which was located in railroad cars. It was on this occasion that Mr. Otjen also inquired as to the status of the PHI bid, "how our figures looked". He, too, was advised that it was AP&L's practice not to reveal the bids of competitors. Mr. Otjen persisted by asking for some indication of how PHI stood. The response was again that PHI had a "competitive bid" and that it must have "used a good, sharp pencil".

There was a great deal of testimony at the trial as to just what the terms "competitive bid" and "sharp pencil" meant. Taking the objective standard, the Court is convinced that such language conveyed the idea that the PHI bid was close to the next higher bid, or to the owner's cost estimates. Mr. Pond knew that the question was asked for the purpose of determining how much, in contractor's parlance, PHI had "left on the table". His response was misleading; it was intended to, and did, reassure and lull the PHI people.

In fairness to AP&L it should be emphatically stated that, although it had reason to suspect, and did suspect, that something might be, and probably was, seriously wrong with the plaintiff's bid, it did not *know* that the bid actually contained any unintentional errors. PHI was known to it as a large and growing contracting company, doing a large volume of business both in this

country and abroad.[2] It was a "big boy" which, one might properly assume, had the resources to take care of its own interests. It speculated that PHI could, possibly, know exactly what it was doing and might even be intentionally entering into a "loss contract" to gain entry into this field of work with the hope that it might make up such losses in future contracts.

With respect to the allegations concerning inducement, it should be noted that the officials of PHI thought they had submitted a bid which would return them a nice profit. Far from being reluctant, they were extremely anxious, as indicated above, to sign up the deal as quickly as possible.

Before concluding the discussion of the plaintiff's "first claim", it is important to review the "errors" or "mistakes" contained in the PHI bid. It is clear that, at even this late date, plaintiff cannot point to this or that specific error or mistake and thereby adequately explain the lowness of its bid. The "mistakes" in fact permeate most of the "civil" construction portion of the bid. There were no clerical or mathematical errors of any importance.

Plaintiff contends that the essential error was simply "an inadequate bid" and that the cause is not important if the defendant knew, or should have known, that the bid was clearly inadequate. It did, however, attempt to establish at the trial the basic causes and basic reasons for the inadequate bid.

Plaintiff attributes its erroneously low bid principally to the failure of Mr. Loren Valentin, who did much of the work on the estimate for PHI, to appreciate, understand and take into account the terrain in, on, and over which the line-system was to be built. However, Mr. Valentin and other representatives of PHI, in the role of prospective bidders, did visit Arkansas in February, 1964 and inspected the route of the line. Mr. Valentin inspected the route by automobile and by airplane. Even though it was like "flying over the Pacific Ocean", he was not disturbed by the wet conditions because he surmised from the apparent uses to which most of the land was devoted (principally farming) that it would support the necessary construction equipment. It was clear that he made some serious errors of judgment in this respect. The "buckshot" land presents many difficulties for a construction project of this type which Mr. Valentin did not understand or adequately take into account. He did not adequately provide in his estimate for sufficient track-type equipment, nor did he take into account the problems of access and the effect of poor access upon production. He also erroneously assumed that members of the craft unions would be employed on certain parts of the work when in fact this would not be possible because of an agreement which AP&L had with the IBEW.

The Court finds that PHI's bid was grossly inadequate and attributes this inadequacy mostly to the failure of PHI's estimators to properly judge the effect of the terrain. As stated, this "error" permeated most of the items in its bid relating to the "civil" construction portion of the job.

■ AP&L was in no way responsible for the mistakes in the PHI bid. Furthermore, even upon examination of the PHI bid and a comparison thereof

2. Paul Hardeman, Inc. had, indeed, had a dramatic growth. In 1959 its volume of completed contracts totalled approximately three million dollars. This rose to between 50 and 60 million dollars in 1961; 80 million dollars in 1962; and 120 million dollars by 1963. The company had expanded in all directions in an effort to diversify. After its merger with the Universal American Corporation it changed from essentially a subcontract operation into a prime contract operation. It engaged in a great variety of projects in the United States and around the world. At one time it was operating in 15 countries simultaneously. It had contracts in connection with the ICBM program, the space program, civil construction projects for the Corps of Engineers, as well as a variety of projects with private companies. It first got into the transmission line contracting field in 1962.

with the other bids, neither CAI nor AP&L could determine the precise source or the exact reason for PHI's alarmingly low bid.

AP&L has called upon the Court to determine if the method and manner in which PHI prepared and submitted its bid was "negligent" or, stated differently, whether the errors in PHI's bid arose out of the negligence and lack of professional competence of PHI's estimators, particularly Mr. Valentin. It is one of AP&L's legal contentions, which will be discussed below, that, if the errors and mistakes contained in the PHI bid were caused by the negligence or incompetence of its own employees, then its errors and mistakes may not be the basis of any legal relief against AP&L. PHI and Aetna contend that the law is otherwise: that the reason or cause of the mistake or error is irrelevant and particularly so in those cases where that error is "palpable" and the offeree must have known of its existence. Under their view of the law, negligence, if ever relevant, can only be considered in the case of two equally innocent parties, which, they assert, is not the situation here. It is their view further that if AP&L was prejudiced by "snapping up" the PHI bid, it was because of its own inequitable conduct and not as a result of any negligence on the part of PHI.

■■ Were the errors and mistakes of PHI the result of the negligence or the lack of professional competence of its own employees? This is a difficult question to answer. It is clear from the evidence that the estimators employed by PHI were well trained, experienced and professionally competent. The testimony indicates that even Mr. Valentin, who bears so much of the responsibility for the errors and mistakes involved in this case, had a good record as an estimator in connection with many of the projects he participated in on behalf of PHI, both before and after this project. His performance here, therefore, must be viewed as a lapse in an otherwise fairly successful career as an estimator. Most

of Mr. Valentin's errors here were based on lack of knowledge, inadvertence, and false assumptions with respect to soil, terrain, weather, and access, as spelled out above. When one compares his estimates for the "civil" portion of the contract with the bid prices submitted by other contractors for the same work, it is quite clear that the estimators of the other contractors did not make the same mistakes as Mr. Valentin. The Court is forced to conclude that the errors in the estimate and in the bid of PHI in this case were due to the negligence of the estimators of PHI, particularly Mr. Valentin, which resulted in their failure to include in their estimates sufficient costs to offset the effects of difficult access, mud and water, and unstable subsoil conditions in many areas. Their errors resulted in a gross and palpable underpricing of most of the items of work included in bid items 1 through 139 (the work necessary to complete all towers in place). Although the errors and mistakes in the bid were due to the negligence of PHI's estimators, and particularly of Mr. Valentin, PHI was not negligent in relying upon the competence and ability of those estimators.

Should the errors and mistakes be classified as being of "fact" or "judgment"? PHI's estimators were in fact misled by appearances and false assumptions on their own part based upon a lack of appreciation and understanding of the peculiarities and difficulties inherent in the overall terrain with which they were dealing. They made errors in judgment in assuming that they had adequate information on which to make a reliable estimate, when they in fact did not have the data they needed.

*The "Second Claim" of PHI and Aetna and the Counterclaim of AP&L*

PHI commenced work on the project around April 1, 1964, and continued to perform such work until approximately December 1, 1964. The Court will not detail the evidence concerning the actual construction of the transmission line and the problems incident thereto. The tes-

timony and the exhibits with respect to such matters are voluminous, and the detailing thereof would serve no useful purpose. Suffice it to say that there were many difficulties and some technical breaches of the contract by both parties. The problems were particularly bad while the project was being supervised by Mr. Valentin in the early period between April and August, 1964. It was during this period that PHI fell substantially behind the schedule. AP&L, with ample justification, made all sorts of threats and protests and PHI struggled to "do better". These efforts by PHI were largely successful. As a result the conditions and rate and quality of production markedly improved from then until into November, 1964. PHI was behind its schedule on the contract work in November, 1964, but its *rate* of production with respect to the foundation and tower work was back to normal. Furthermore, its failure to maintain the schedule, even in the early stages of the work, although in part due to its own deficiencies, was not solely PHI's fault by any means. The delays were contributed to by the actions and inactions of AP&L and CAI. They were also contributed to by the very mistakes (principally concerning the terrain) that resulted in the palpably low bid of PHI in the first instance.

Before analyzing the situation that existed in November, 1964, it should be stated that from time to time during the course of construction PHI improperly constructed towers and improperly installed the foundations which caused delays and called for time-consuming corrective work. It was late in commencing the stringing operations for the conductor and overhead ground wire. When PHI did get to the stringing work, it experienced many difficulties. It made many mistakes; but through trial and error and experimentation it was in the process of resolving such difficulties at the time of the termination of the contract. Moreover, the plaintiff's failure to maintain the schedule of the work was contributed to by AP&L's failure to provide cleared right-of-way and failure to provide required design data in a timely manner or in a manner which would permit PHI to plan its work far enough ahead to efficiently do the work and to avoid the necessity of "skips". AP&L's scheduling and delivery of materials also handicapped PHI from time to time. Furthermore, it is the Court's impression that AP&L, through its engineers, CAI, was very rigid and inflexible in exercising discretion with respect to permitting PHI to use alternative foundation structures in lieu of augered foundations in certain situations where the use of such alternatives would not compromise the project. The inspection standards and methods of CAI and AP&L were overly strict and unnecessarily burdensome on occasions, although on occasion such practices were modified to provide relief for PHI.

■ In summary, neither party was totally without blame, and both had committed a substantial number of "breaches" of their expressed and implied contractual undertaking prior to the termination on November 28, 1964. After listening to the testimony, the Court is convinced that this is not an unusual situation. Regardless of the competence and goodwill of the parties to such a monumental undertaking, one would expect a multitude of problems and, indeed, "breaches" of the agreement from time to time. The evidence indicates that in the ordinary case these are usually cumulated and negotiated away during, or at the conclusion of, the project.

By November 28, 1964, PHI had, overall, performed slightly less than half of the contract work. It had completed in excess of 70 per cent of the foundation work and approximately 60 per cent of the tower construction. Slightly over ten per cent of the "conductor" or "stringing" work had been completed.

As of November 28, 1964, one of the key considerations in evaluating the anticipated future progress of the work was the likely completion date for the

foundation work. That work was scheduled to be completed by the first of January, 1965. Although everything slowed down during the chaotic "confrontation" period in November, the Court is convinced and finds that both PHI and AP&L were basically satisfied with the progress of the foundation work as of the first of November and would have, reasonably, even as of November 28, 1964, projected the completion of all such foundation work sometime in the middle or latter part of January, 1965. If one looks at the actual situation that obtained after AP&L's decision to terminate PHI and hire Jelco, he will immediately realize the importance of this factor. So much of the actual cost of completion by Jelco was due to its failure to complete the foundation work in the early weeks of 1965. The effect of the storms, rain and wet conditions that so greatly impeded Jelco's progress in the early months of 1965 would have been greatly reduced had it been "out of the ground" and through with the foundation work. It is true that tower construction would be, and was in fact, also adversely affected by the weather and wet land conditions, but these latter factors were not nearly as great a handicap in connection with the tower erection work as they were in connection with the foundation work. Furthermore, although the tower erection had fallen considerably behind in the early months of the contract, the rate of that work had picked up substantially by the end of September, 1964. In fact, that *rate* during September, October and the first two weeks of November, 1964 was approximately as projected. The problem was that PHI had completed only about 60 per cent of such tower work by November 28, 1964 when it should have completed almost 80 per cent of that work by that date. The original schedule called for the completion of the tower erection work by the second week of January, 1965. The Court is convinced and finds that the parties, upon the basis of the information known to them on November 28, 1964, would have also con-

cluded that, had PHI proceeded with the project, it would have completed the tower erection work in February, 1965. This, too, is important to note in the light of the later actual experience of Jelco. Had the foundations been completed in January and the tower erection in February, 1965, not only would the cost and expense of those portions of the work have been drastically and dramatically less than the actual cost to Jelco therefor, but also the cost and the expense of, and the time for completion of, the stringing work would have been dramatically reduced. The Court further finds that PHI had the financial resources to complete the project, even if it had not been able to negotiate an increase in the price with AP&L and that PHI could in fact have completed the project, not by the original scheduled time of completion but in time to interface with TVA so as to fulfill the objective of the project and avoid any penalties upon AP&L. (Note also: AP&L had, by the end of November, 1964, impliedly waived its right to insist on full performance by PHI on or before the completion date; and, independently of such implied waiver, PHI would have been entitled to some additional time because of the breaches and defaults of AP&L which had the effect of slowing down PHI's performance of the work.)

In the light of the above facts, how did it come about that AP&L decided to discontinue all work under the contract and to terminate PHI?

The real "beginning of the end" came about almost by accident as a result of a meeting on October 28, 1964. That meeting was called to discuss the job and its progress. Mr. Falls of CAI was present, as well as Mr. Otjen for PHI. They discussed "where we were", "what we had done", and "what we were going to do". At this point some of the problems that had seemed quite serious in July and August with respect to footings and steel appeared to have been worked out for the most part. The stringing of the wire was the big concern. Mr. Falls asked if PHI would con-

sider subcontracting this work, and Mr. Otjen replied that PHI would consider this possibility. Mr. Falls stated that Foley-Jelco had had a lower price on the stringing portion of the contract than PHI and that, therefore, PHI might want to contact them about the subcontract possibilities. Mr. Falls gave Mr. Otjen a phone number he could use for this purpose. He called from Conway, Arkansas. It was during this telephone conversation with representatives of Foley-Jelco that PHI learned, through Mr. Otjen, for the first time, the approximate bid that had been submitted by Foley-Jelco back in March. Mr. Otjen was told that Foley-Jelco had bid a "shade under four million." He was shocked by this information and went back to Los Angeles to discuss the matter with Mr. Paul Hardeman and with Mr. Patrick Black. (Note: during the telephone conversation Mr. Otjen was informed that Foley-Jelco would not be interested in any subcontract arrangement except on a cost-plus basis.) The problem was discussed internally by the people at PHI for several days, and resulted in a decision that PHI approach AP&L for "additional costs". The result was a letter dated November 16, 1964, which reads as follows:

"We have recently become informed of certain information which gravely and seriously affects our overall relations with you on the above mentioned contract.

"We bid this contract on a unit price basis. The total of all unit prices is in the approximate figure of $2.7 million.

"The bids were opened on March 23, 1964. On March 25, 1964 and on April 2, 1964, both prior to your receipt of our executed contract, and on numerous occasions thereafter, our representatives conferred with your personnel and personnel of Commonwealth Associates, Inc., your agent, concerning this contract. On each of those occasions attempt was made by Hardeman personnel to ascertain the amounts of the other bids which were received and by what amount our bid was the low bid. Your personnel and that of Commonwealth Associates, Inc. refused to disclose that information. On the other hand, various remarks were definitely made at these meetings by representatives of your organization and that of Commonwealth Associates, Inc. to the effect that our bid was within reasonably competitive range of the other bids. These comments were made on various occasions and in various forms, all to the unmistakable effect that our low bid was not excessively or unreasonably low as to be out of the range of the other bids. Our personnel at all times in these meetings were given the impression that our bid was not excessively lower than other bids, and we were led to believe that the difference in bids was certainly less than the amount of our bid bond which was $300,000.00.

"As this job has progressed, we have recently become aware of the fact that certain of the unit costs are substantially and grossly in excess of both our estimates and the unit prices based on those estimates which were included in our bid. We recently undertook a review of the procedures under which our bid was prepared and we have found that unfortunately certain serious mistakes were made, which resulted in gross underestimates of certain unit costs.

"Further inquiry now indicates that these mistakes in our bid to you may have been such that the spread between our bid and a bid free from mistake would be in an amount in excess of $1.00 million.

"With the information presently available to us we can only conclude that Paul Hardeman, Inc. has been deliberately misled by your conduct and the conduct of Commonwealth Associates, Inc. in this matter.

"In view of the facts set forth in this letter, we request that a high level meeting take place immediately and

not later than November 23, 1964, to consider all aspects of this situation. "Unless immediate steps are taken toward a solution of this matter, including but not limited to equitable relief, we will definitely consider stopping all further performance on the job or taking immediate legal action to obtain a declaration of our legal rights, or taking both such actions."

As a result of the request contained in the letter of November 16, 1964, a meeting was held on November 24 attended by Mr. Lewis, Mr. Phillips and Mr. Pond for AP&L, Mr. Warren, Mr. Falls and Mr. Sanford of CAI, and Mr. Otjen, Mr. Woods and Mr. Schwartz of PHI. Mr. Schwartz was an attorney for PHI. It appears that Mr. Horace Jewell, an attorney for AP&L was also present. At the meeting Mr. Otjen mentioned the information he had discovered with respect to the Foley-Jelco bid and requested negotiations for additional funds, stating that PHI had made mistakes in its bid. In response to inquiries from Mr. Lewis, however, Mr. Otjen refused to state the nature or the details of the errors or mistakes. Then the parties discussed the progress being made on the job and particularly the problems with respect to the stringing of the wire. Representatives of AP&L asked Mr. Otjen if PHI wanted to be terminated, or wished to continue with the construction of the project. Mr. Otjen replied "unequivocally" that it did not want to be terminated but, on the contrary, wanted to complete the job. At this point representatives of PHI were asked to leave the room. They were later called back, at which time they were advised that AP&L would give consideration to their request and contact them in a couple of days.

On November 28, 1964 Mr. Otjen received a telephone call from Mr. Lewis advising that AP&L had decided to terminate PHI and that a letter to that effect was in the mail. This letter, which has been quoted above, was received on November 30, 1964. Upon receipt of he letter Mr. Otjen again called Mr. Lewis and asked him to reconsider. Mr. Lewis advised that AP&L's position was firm. PHI then responded with the telegram, dated December 1, 1964, which is also quoted, *supra.*

Why did AP&L decide to discontinue the work and terminate PHI? AP&L contends it was for the reasons stated in its letter of November 28, 1964 and resulted from the opinions of CAI "that the schedule of work is not being maintained and that at the present rate of progress the work will not be completed within the contract time; that you have been and are violating many of the conditions and agreements of the contract and contract documents; and that you are not executing the contract in accordance with the terms of the contract." The plaintiff and Aetna deny this and argue that, as of November 28, 1964, AP&L was itself in substantial and unexcused default upon its obligations under the contract and would shortly find itself in even greater default; that the letter opinion of CAI was produced at the request of AP&L to form the justification for the decision to terminate the contract, which decision had already been reached for other reasons.

■ The Court finds that the PHI letter of November 16, 1964 was the precipitating factor resulting in the decision to terminate. Conditions with respect to foundation and tower construction had materially improved in the period from August to November. Great difficulty was being experienced with the new stringing operations, but it was not clear at the time that PHI would not successfully work out these problems and be able to string the conductor and static line satisfactorily. Furthermore, there was the possibility of an agreement between AP&L and PHI to subcontract this phase of the work. PHI's letter of November 16, 1964 altered the basis for evaluation of the entire project by AP&L. PHI had discovered the approximate amount of the Foley-Jelco bid, and was raising legal and factual questions concerning the whole bidding process and the resultant legal status of the

parties. From this point on, legal questions began to predominate in the eyes of AP&L officials over the technical and engineering questions. Indeed, the Court finds that the management of AP&L was affronted by PHI's inquiry and took it quite personally. The reaction, clearly inferable from the evidence, was basically subjective, emotional and visceral. Furthermore, the officials of AP&L at the time were convinced that PHI had grossly underestimated and underbid the job and could only complete it at a substantial loss. They suspected PHI was in serious financial distress. And PHI was calling upon AP&L to open negotiations looking towards an increase in the contract price of approximately one million dollars. Although the legal situation was very much in doubt, they felt that there was at least a possibility of holding PHI and Aetna legally responsible for the amounts necessary to employ a third party to finish the contract. Although PHI had not quit working and had 'not even stated that it would quit if it did not obtain additional consideration, still the possibility was there. Further, AP&L knew that if it proceeded with PHI, the latter would be doubly alert, under the circumstances, to charge AP&L with any breach of the agreement on its part and the situation was such that there were likely to be serious breaches by AP&L (particularly in regard to right-of-way acquisition) if the project continued ahead full blast. Officials at AP&L felt that the PHI letter of November 16 called for a legal showdown with PHI. They then made the decision that it would be best to get PHI off the job and bring in a new contractor on a cost-plus basis. The Court finds and concludes that AP&L was not justified in dealing with the problem in this draconic manner. Its action in doing so was wrongful and constituted an overriding breach of the agreement which not only prevents it from obtaining judgment for the cost of the completion of the work but, to the contrary, forms the legal basis for PHI to obtain monetary relief against AP&L. *See infra.*

At this point it would be well to mention what was contemplated by the "change over" to a new contractor. It was recognized by all that basically the same "nuts and bolts" work force would do the work whether the contractor was PHI or some third party. The new contractor, however, would bring in certain of its own supervisory personnel. All of the operating and construction equipment that had been used by PHI would be available to and used by the new contractor. However, being without effective financial restrictions and being on a cost-plus basis, the new contractor would be in a position to augment the equipment used. As of November 28, 1964, AP&L was dealing with a time frame of approximately six months. Reasonably, it could contemplate a delay of from several weeks to a month in the new contractor's getting on the job and at work, even though that new contractor was essentially taking up where PHI left off and with essentially the same work force and equipment. The change contemplated, therefore, was more related to management, some expertise, and increased equipment and financial resources than one would ordinarily think when considering substituting one contractor for another.

■ Although PHI had actually expended over three million dollars in completing slightly less than half of the contract (when measured by the dollars allocated in the bid and contract for the various items or units of work), it does not follow at all that, had PHI remained on the job, the cost of completing the "other 50 per cent" would have also come to approximately three million dollars. In fact, the Court is convinced from the evidence that such would not have been the case. The mistakes which PHI made which were responsible for its grossly low bid were made primarily in connection with the "civil construction" portion of the contract. Approximately 82 per cent of the $3,054,166.82

expended by PHI prior to the termination of the contract is attributable to the "civil" portion of the contract, which amounts to approximately $2,500,000, leaving only approximately a half million dollars having been expended for the "wire stringing" portion of the project. As has already been noted, PHI had completed approximately 70 per cent of the foundation work and approximately 60 per cent of the tower construction work by November 28, 1964. It is also clear that during the period from August into November, 1964, the rate and efficiency of the foundation and tower work had improved significantly. Therefore, the amounts required to finish such work, had PHI been permitted to proceed full speed ahead (thereby, in all probability, completing such foundation and tower work in January and February, respectively), would undoubtedly not have exceeded a straight-line projection of the costs of that portion of such work as had already been performed prior to November 28, 1964. Just as certainly the actual cost experience of Jelco in completing such work cannot be used as a basis for projecting PHI's costs since the circumstances and conditions under which Jelco operated were completely different and distinct from those under which PHI would have operated had the contract not been terminated and if PHI had been permitted to proceed posthaste. Furthermore, the miserable start by PHI of the stringing operation cannot be used as a basis for predicting its performance with respect to the remaining portion of that work. In fact, it is quite clear that PHI had, through trial and error, discovered and, to a degree, come to grips with the myriad and difficult problems incident to this new type of stringing operation by the end of November, 1964. Relatively few people are required to perform the stringing procedures, but the quality of those few individuals is extremely important. In like manner, the quality of the stringing machinery and equipment is extremely important.

On the basis of the evidence, the Court finds that PHI could, had it not been terminated in November, 1964, have completed the stringing operation at least as early as Jelco in fact completed that work, even without adding more equipment than it contemplated using on the stringing operation. It cannot be said that PHI, considering its poor start on the stringing operation, would have made any profit on that portion of the contract, but it might have, and it could well have at least broken even on that part of the work. Foley-Jelco's bid of $3,840,276.50 included $1,017,805.50 for the stringing. PHI's bid included $1,220,204.00 for this purpose. PHI had spent approximately $500,000.00 by November 28, 1974 on the wire but had only completed some ten per cent of that work. But this excessive proportional cost was clearly due in very large part to the initial very costly learning experiences it went through. In that process it learned what was needed in personnel and technique to successfully prosecute such work. It had, according to its bid, over $700,000.00 left to finish that work and this included its estimated "profit".

To sum up: the problem was created by the estimating and bidding errors and mistakes of PHI; it was continued as a result of the policies and the actions of AP&L in refusing to disclose its own doubts and concerns about PHI's bid and in misleading plaintiff in this respect; and it was finally turned into the ultimate financial disaster by AP&L's wrongful and bad faith termination of the contract. The result: tragic economic waste and a situation in which everyone loses.

*Issues of Law*

The following discussion of the legal issues will also include, where appropriate, factual findings which will supplement those set forth in the earlier parts of this opinion.

PHI and Aetna argue that if a bid, such as plaintiff's here, is so much lower than the other bids or the owner's cost

estimates (here the difference between plaintiff's bid and the next lowest bid was approximately 40 per cent, and between the plaintiff's bid and the owner's estimate in excess of 80 per cent; the dollar differential was $1,100,000 between the bids and over two million dollars when comparing the bid to the cost estimate), that any reasonable person would be put on notice that the bidder might have erred, and probably did err, in preparing the bid, then it makes no difference that the offeree may not know what caused the error. They contend that the bid price in such circumstances would be "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other", quoting from Hume v. United States, 132 U.S. 406, 10 S.Ct. 134, 33 L. Ed. 393 (1889). They also quote from Beard v. United States, 3 Ct.Cl. 122, as illustrating the theory underlying their "first claim":

> ". . . They (the prices) are so extravagant and exorbitant that no prudent man, acting for himself in his own affairs, would agree to pay them, unless it were done under some mistake or delusion, *of which it would be unfair and unconscionable for the other to take advantage* . . .".

> ". . . Gross inadequacy or gross exorbitancy of prices, such as no man advised of his rights would give on the one hand, and such as no honest man could conscientiously receive on the other, *are universally acknowledged badges of imposition or fraud* . . .". (Emphasis in plaintiff's brief.)

When the offeree is put on notice of the likelihood or possibility of a miscalculation or a mistake in the bid, PHI and Aetna contend that the offeree is not permitted to simply "snap up" that bid. In that situation they contend that normal and acceptable conduct would require the offeree to: (1) warn the bidder in some way that his bid is suspect and request verification; (2) ascertain whether the bidder has some unique or acceptable method of performance that would enable it to perform the job at the bid price or is intentionally submitting an entirely inadequate bid; or (3) reject the bid. If the offeree does not follow one of these courses of action and, indeed, simply accepts the offer, plaintiff and Aetna contend that it thereby also accepts the risk of an unenforceable contract. In this connection, they quote the following language from Ex parte Perusini Const. Co., 242 Ala. 632, 7 So. 2d 576 (1942), as follows:

> "If one of the parties, through mistake, names a consideration that is out of all proportion to the value of the subject of negotiation and the other party realizing that a mistake must have been committed, takes advantage of it and refuses to let the mistake be corrected when it is discovered, he cannot under these conditions claim an enforceable contract. When there is a mistake that on its face is so palpable as to place a person of reasonable intelligence upon his guard, there is not a meeting of the minds of the parties, and consequently there can be no contract, 6 R.C.L. page 623, section 42; 12 Amer.Jur. 624, section 133, and cases there cited."

The controlling law, as it has developed in Arkansas and most other states, recognizes that construction contracts are a separate breed of animal; and, even if not completely *sui generis*, still that that law must be stated in principles reflecting underlying economic and industry realities. Therefore, it is not safe to broadly generalize. True, general principles of contract law are applied to construction contracts, but they are applied under different operative conditions. Care must be taken, then, not to rely too uncritically on such cases as those arising from the sale of real or personal property. And even within the larger rubric of "construction contracts" it is manifest that the law, if sensitive to the underlying realities, will carefully discriminate between, say, a contract to construct a home and a contract to construct a fifty-story office

building; between a contract to build a private driveway and a contract to construct an interchange on an interstate highway. This is what one would expect *a priori;* this is, generally, what one finds when he reviews the actual development of the law.

The growth of the law which affects the disposition of the issues in this case can be best understood from a review of the following law review articles: "Equitable Relief for Unilateral Mistake", 28 Columbia Law Review 859 (1928), by Edwin W. Patterson; "Unilateral Palpable and Impalpable Mistake in Construction Contracts", 16 Minnesota Law Review 137 (1931), by Benedict Lubell; and "Unilateral Mistakes in Construction Bids: Methods of Proof and Theories of Recovery—A Modern Approach", 5 Boston College Industrial and Commercial Law Review 213 (1964), by Wendell F. Grimes and Barry J. Walker.

The terminology "palpable" and "impalpable" was apparently given currency by Professor Patterson in the first article cited. There he mentioned a contracting situation in the category of "unilateral mistake not known to the other party". Deciding that this phrase was too cumbersome, he employed the shorter description, "unilateral impalpable mistake". Professor Patterson notes that the use of the term "palpable" finds support in Moffett Hodgkins & Clarke Co. v. City of Rochester, 178 U.S. 373, 20 S.Ct. 957, 44 L.Ed. 1108 (1900). In a footnote he points out:

> "While 'palpable', etymologically, refers to the sense of touch, it has acquired by usage a broader meaning: 'Manifest to sight or touch; . . . plain; evident; obvious, easily experienced or detected'. Century Dictionary (1895)."

His analysis of the effect of a "palpable mistake in contract" is instructive:

> *"Palpable mistake in contract.* Where *A* is induced to promise to *B* by an erroneous supposition which is so palpable to *B* that we infer he must have 'known' of it, we can say either

that *B* did not *actually* expect performance of the promise (men usually try to wriggle out of such catching bargains), or that *B*, on ethical grounds, *ought* not to be allowed to enjoy a bargaining advantage thus gained. So far as the writer can discover, there seems to be no clearly marked opposition between equity and law on this point, though the 'duty' to disclose to another facts about which the latter is palpably mistaken is less commonly accepted in law than in equity. However, it seems that the promisor has a defense to an action at law, or may rescind in equity where that jurisdiction is appropriate. The leading case of Moffett Co. v. City of Rochester is a case of palpable mistake. The plaintiffs made an error in estimating the price at which they would bid for certain excavating; they bid $1.50 a yard instead of $15.00 a yard, making a difference of $63,000 in their total bid. The Supreme Court, in granting rescission, said the error was so palpable that it must have come to the attention of the offeree. The decision has been improperly cited for the doctrine that equity will give rescission for unilateral impalpable mistake in an estimate. In a considerable number of cases which talk about 'meeting of minds' and equitable relief for hardship, the situation was really one of unilateral palpable mistake.

"The distinction between palpable and impalpable unilateral mistake thus has, in a majority of courts, important legal consequences, for it makes the difference between rescission and no rescission of the bargain. It is believed that the application of this distinction will, as a rule, greatly narrow the scope of the conception of impalpable mistake, and will allow rescission for the grosser errors which cause the greater hardship to the promisor. That is, the greater the disparity between the promisor's erroneous stimulus and the terms of the bargain, the greater the likelihood that the exis-

tence and effects of this stimulus were palpable ('known') to the promisee. This is especially true in the case of mistakes in estimates which are converted into offers. Here the difficult introspective inference of palpability is commonly drawn from the degree of disparity between the amount offered and the amount which would have been offered had the mistake not occurred. However, the distinction has been applied to other kinds of mistakes, in which the introspective inference is more difficult. Whether the mistake, besides being a 'but-for' cause, must also be 'vital' or fundamental (as Professor Williston suggests), in order to defeat enforcement of the bargain would seem to depend upon whether the theory of the relief is that the promisee did not actually expect performance, or that he *ought not* to have expected performance. If there is no expectation in fact, then there is 'no contract'. This view is supported by the cases which, without a technical rescission for fraud, allow the mistaken party to recover in *quantum meruit* the value of his performance. On the other hand, to hold that the promisee *ought not* to enforce a bargain so made involves a holding that the promisee is the responsible cause of the promisor's entering into the bargain under the mistake, and this involves a postulate that non-disclosure by the promisee is fraudulent or unconscionable. In view of the general tendency to hold that such non-disclosure is not fraudulent, courts of equity may be reluctant to impose a 'duty' of disclosure except where the mistake is 'vital' or 'fundamental'. It is believed however, that the law on this point is in a period of transition, and that the conception of unilateral palpable mistake will eventually establish a higher ethical standard for bargaining methods."

The developments in the law have proved Professor Patterson to be a fairly accurate prophet.

Most of Professor Patterson's article deals with the psychological elements involved in a unilateral mistake case and the legal theories used by the courts in analyzing mistake cases. He concludes his article as follows:

". . . [T]he problems of equitable relief for unilateral mistake are extremely difficult, not only in respect to analyzing the underlying postulates of our theory, but also in applying the analysis to complex and fugitive facts. Despite much talk about 'meeting of minds', it is believed that in a majority of jurisdictions the 'objective' or expectation theory of contracts prevails in equity as it does at law. In selecting the significant or legally operative facts from the wealth of psychological facts that occur with every bargain, the 'equity' courts move within the same set of psychological and economic postulates that are applied by the 'law' courts."

Mr. Lubell and Messrs. Grimes and Walker, in their later articles, concentrate on the application of the general theory, as developed by Professor Patterson, to construction contracts and construction bids. Mr. Lubell first considers the "impalpable mistake" cases:

". . . The solution to the problems implicit in this type of case is not easily found. Assuming the mistake to be impalpable, or unknown to the other party, the builder or owner has entered into a valid contract, or has accepted a low bid and returned the other deposit checks in reliance upon an estimate submitted by a person who is presumably competent, and more than likely, expert. If an expectation of performance is ever aroused upon the formation of a contract, this promisee's expectation has been aroused. To permit the contractor to withdraw from the contract without penalty simply because he has added a column of figures carelessly, seems hardly a desirable result.

"On the other hand, are we to force a contractor who has made an honest,

though careless blunder, either to pay damages, or to go through with a contract he never thought he was making? Are we to require him to perform when all profit is taken from the transaction and a loss perhaps to be incurred? Practically, as every business man knows, a forced performance without profit and with the possibility of a loss will result in shoddy material and poor work.

"In many cases if the bidder refuses to perform, it will mean the forfeiture of his deposit check which may result in a handsome but hardly deserved gift to the owner. To refuse rescission means forfeiture of the deposit, or damages to be paid the owner for his loss of bargain. To grant rescission denies compensation to the promisee for his disappointed expectation in a situation in which he has been free from fault.

"In the protection of this expectation of the owner, the courts have resorted in many instances to the device of calling the contractor negligent. And that seems to have decided the case. The great difficulty with this method is that it does not offer any solution to the problem. The desired result having been found, these courts have resorted to a label, a 'vituperative epithet' to explain their decision."

The author then discusses the facts in two Illinois cases, and goes on:

"In the *Steinmeyer Case* the mistake was impalpable; in the *Bromagin Case* it was not, and that may well be the basis for the difference in result. But calling one negligent and the other reasonable is not deciding anything.

"While the court's sympathies may be aroused to favor the contractor who was ill when he estimated his bid, that this fact should make the mistake any less negligent is untenable. That there should be a difference in legal result depending on extrinsic emotional factors would be a definite and un-desirable departure from established doctrine. If relief is to be denied for impalpable mistake, the reason for doing so must be more substantial than a condonation of the negligent action of the mistaken party.

"Another familiar device of the courts found repeatedly in these mistake cases is the use of the 'meeting of the minds' doctrine. This too is a rationalization. In those cases in which relief is to be given, the courts find that there was no meeting of the minds. But where relief is to be denied, curiously enough there is a meeting of the minds, even though the contractor was just as mistaken, and despite the fact that had he known of the mistake the contract would not have been signed, nor the bid submitted.

\* \* \* \* \* \*

"It appears, therefore, that in addition to the fundamental objections to the doctrine of the meeting of the minds, there is the further objection here in its inconsistent and illogical application. Like the use of the term 'negligent', it is a rationalization, a post-decision label, and not a basis for deciding future cases.

"An examination of the cases of unilateral impalpable mistake in construction bids indicates a general tendency to deny relief to the mistaken contractor, thus following the rule set down in other types of unilateral impalpable mistake. As between the two hardships, the courts feel that the better result is attained in protecting the expectations of the owner with whose conduct no fault can be found. This protection of expectation by denial of equitable relief thus applies to these cases the considerations used for the most part in courts of law. Since the merger of law and equity there is no good reason for contrary methods of approach. The result of so holding is salutary, the weight of authority is with it, and law and equity become unified."

Mr. Lubell then contrasts the "palpable mistake" cases:

". . . In the case of a palpable mistake, other considerations face the courts. It may well be argued that there is no reasonable expectation aroused in the owner when he knows of the contractor's mistake. Actually there may be grave doubts in his mind whether the contract will be performed upon the discovery of the mistake. If it is discovered, as a business man he knows that the wisest course will be to permit the contractor to withdraw. And if the expectation consists in the wish that the mistake will not be discovered until performance is completed, that is a gamble at long odds and not an expectation.

"Regardless of whether or not there is an expectation in fact, the courts feel that on ethical grounds the promisee should not be permitted to take advantage of the mistake. Business acumen is respected and the employment of skill in driving shrewd bargains is upheld, but the ability to take advantage of a mistake requires little more than a hard conscience and is not encouraged by the courts. This aversion to 'snapping up' a bargain, coupled with the fact that there may be no expectation worthy of protection, have led to the holding in a large majority of the cases of mistaken construction bids that relief will be granted where the mistake is palpable.

"In most cases, therefore, the question of relief turns upon the palpability of the mistake. Consequently, it becomes highly important to consider under what circumstances a mistake does become palpable. Of course, actual knowledge of the mistake brings the case within the field. But as a matter of proof, this is likely to be very difficult.

"With the public bid, where the executive board is assembled when the bid is opened, notice of the mistake by the city engineer or by some member of the board may often be proved. But in the case of the private bid, proof of actual knowledge is unusual. It may be that in an unguarded moment, or in a burst of confidence, the owner will confess his knowledge and good fortune to one who will later testify but such a situation is most unlikely.

"Palpability must, therefore, be a matter of inference. The court must assume from the facts, from the discrepancies of the bids, from the experience of the owner or contractor, that he knew of the mistake. In the light of the decided cases, this seems to be the position which has been adopted."

Mr. Lubell then discusses several cases and concludes:

"From these cases it is quite clear that the palpability of a mistake which will be the ground for relief to the mistaken party may be inferred by the court from the fact that the promisee should have known or must have known of the mistake where it does not appear as a matter of fact that he actually did. This inference is drawn largely because the contractor's bid was so low in comparison with the other bids submitted or even with the owner's implicit estimate that a reasonably experienced business man would suspect that a mistake had been made. This owner, being that reasonably experienced business man, consequently must have known (i. e., probably did know) of the mistake.

"The result of this approach is clearly conducive to a higher ethical standard in business operations. If the skilled contractor will be held to have known of a subcontractors' mistake, fewer contracts based upon an erroneous bid will be signed. The courts will have discouraged successfully the 'snapping up' of another's mistake."

Messrs. Grimes and Walker start their discussion with a question:

"What are the remedies of one who has prepared a bid for a particular construction project and whose bid,

saturated with a substantial and material error caused by the bidder's own mistake, has been accepted by the other party?"

Their article reviews the developments in the field of unilateral mistake in construction bids occurring subsequent to Professor Patterson's and Mr. Lubell's articles, and then suggests methods of proof and standards of recovery to be applied "in this ever-growing and vastly complex field of law". The Grimes-Walker article concentrates on the issues now before this Court.

". . . Of more importance for purposes of this article is the case wherein the bidder seeks to utilize his mistake as a basis of rescission or reformation of the contract after either partial, substantial or complete performance, with recovery off the contract for the value of the work performed. Interesting questions arise concerning the several available methods of computing this recovery.

"To qualify for equitable, or other non-statutory relief, the bidder must show by clear and convincing evidence, not by a mere preponderance of the evidence, that a material and substantial mistake was made in the preparation of the bid, that the bid was infected with or saturated by this error and that the mistake was known or should have been known by the other party. For purposes of a clear understanding of the cases and the knowledge concept discussed therein, 'known' means either actual, subjective knowledge or objective knowledge in the sense that from all the circumstances the accepting party is charged with knowledge that something was wrong with the bid. Generally, the law is phrased that if the party receiving the bid knows or has reason to know, because of the amount of the bid or otherwise, that the bidder made a mistake, the contract is voidable by the bidder."

Here AP&L contends that before the "first claim" theories of the plaintiff can even be considered, plaintiff must show that there was a "particular mistake" in the bid:

"The simple fact is that the plaintiff has never alleged any real mistake, and as a matter of fact, has stated there is no particular mistake, and that the entire bid—every item—is just too low. Even assuming that the Arkansas Power & Light Company knew that the bid was unusually low and that it actively concealed and misrepresented this fact to the plaintiff, (of course, we deny either of such assumptions), a particular clerical or mathematical mistake must have occurred which would justify the 'cancellation' or rescission of the bid before the plaintiff could receive any relief whatsoever". (Defendant AP&L's brief).

The defendant contends that before rescission may be granted there must be a clerical or mathematical mistake which goes to the bases of the contract, and this error cannot be merely the underestimating of cost and material or an error in judgment. After discussing just such contentions, based upon an analysis of the type of mistake, Messrs. Grimes and Walker state:

"The questions presented in all cases of unilateral mistake are whether the mistake is material and substantial, whether the ultimate bid is infected with or saturated by the error and, finally, whether the offeree knew or should have known that the bid was materially in error. It is to be noted that it is not a requirement for, or condition of, relief that the offeree know, either objectively or subjectively, the exact nature of the error.

"None of these fundamental issues can be helpfully answered by first classifying the error into either one of mechanics or one of judgment. The fact of the existence of an error and the effect of this error, be it of judgment or mechanics, upon the intended bid should be enough to start the legal proceedings toward relief."

The authors then turn to the methods of proof required:

"Rare is the case wherein the proof offered is actual, subjective evidence that the defendant knew that the bid was in error. This is so because the only evidence available would be either extrajudicial statements or conduct of the defendant admissible under the hearsay exception concerning admissions. Generally, the defendant-offeree does not have access to and has not reviewed the work sheets, which are a prime source of error and upon which a final bid is based. Thus, one of the very best sources of actual knowledge of an error is not even available to the offeree. Therefore, in the overwhelming number of cases the method of proof utilized must be circumstantial in nature.

"There are various types of circumstances serving to charge an offeree with knowledge. For purposes of this discussion, these can be grouped into four general fact patterns, each of which will be discussed separately herein.

"The first of the fact patterns appears in cases where there is a wide range between the low, erroneous bid and the other bids submitted.

"The second embraces those instances where there is a substantial difference between the bid submitted and an estimate prepared by or for the offeree.

"The third is made up of those cases where a wide disparity exists between the bid submitted and the amount which the offeree, by reason of his prior experience in situations similar in nature and scope to the contract in question, could reasonably expect a bid to be.

"The fourth consists of those cases in which there exists a substantial degree of difference between the bid as submitted and what the bid, but for the error, would have been.

"As to each of the above patterns, it is submitted that the occupation, prior experience and expertise of the offeree are relevant factors in ascertaining whether the defendant is to be charged with knowledge of the existence of error in the bid."

In discussing the causes of the variation in bids, Mr. Lubell notes that in our modern industrial system it could ordinarily be expected that bids on a particular piece of work would vary but little. He then points out, however, that there are numerous considerations in individual cases which could adversely affect this expectation. Nevertheless, he concludes:

"But despite the influences of these economic factors on the bids submitted, there is a range of variation into which all bids will fall. Of course the variation will be greater than it would be if these factors were not present. The variation, for example, may be as high as 30% for a bid of a certain size, whereas under other circumstances it might not be more than 5%. But once it is established that bids for that size contract vary to the extent of 30%, any bid in that class which varies 50% or more demands investigation, for clearly a mistake of some kind has been made. It was with a view to establishing the normal range of variation in several classes of bids that the tabulations contained in the appendix were organized."

To establish the reliability of this approach the author then analyzes bids which he collected in his research, to wit: subcontractor's bids to a private contractor in connection with the construction of various buildings and bids submitted by contractors to the board of transportation of New York City for public work. After analyzing these bids, he states:

"An examination of the tabulations of percentages indicates a definite trend. As the dollar size of a contract increases, the percentage of variation decreases. When the bid is in the low thousands, the percentage variation taken on the average is as high as

32% in the public work bids and 21% in the private bids. Using the percentage variation on the low bid, for public work it is as high as 20%, and in private bids, 48%. As the sums mount into the hundred thousands, the variations decrease generally. In the millions, the highest variation under both methods is 6%. Reference to the tabulations will fix the variations for specific sums; an extended discussion and elaboration of them here is unnecessary.

"It may be said, therefore, that where the bid is in the thousands, a fairly high percentage of variation is expected; one between 30% and 50% is usual. Consequently a low bid which varies to that extent is anticipated by the expert contractor or builder. But a bid with a greater percentage of variation is highly unusual. If a mistake is shown in such a bid, the court will be well justified in calling it a palpable mistake.

"With the dollar increase, as has been shown, the percentage variations decrease, so that a much smaller degree of variation may constitute warning of a mistake. It will be noticed that in the case of the public work bids ranging in averages from $111,640.00 to $367,074.00, the largest variation, using the second method, is, with one exception, 5%. That one exception, a 14% variation on the bids for telephone and emergency alarms, provides an excellent and most gratifying practical application of the theory which the writer has attempted to develop. According to the rule set out, that bid because of its high relative variation should give notice of a mistake. As a matter of fact, the low bid in that group was not accepted. The whole set of bids was thrown out by the board of transportation and the work readvertised."

Mr. Lubell then applies his approach to a discussion of several cases and concludes:

"These cases demonstrate that where the variation is greater than is to be expected in bids of that size, relief will be granted, but where the variation is normal, relief will be refused. By the use of tables similar to those set out in the appendix, the usual variation for any particular size of construction contract may be determined.

"There is little doubt that evidence of a normal variation and departure would be admissible in a particular case. In practically all of the cases of mistake which have been considered, evidence to prove the mistake and knowledge on the part of the owner has been admitted. If palpability is to be a matter of inference from what the reasonable man would expect, it must follow that evidence showing what the reasonable man normally expects is proper."

The author then discusses certain modern, enlightened business practices and states:

"In the light of these practices, it is highly probable that litigation involving mistaken bids is on the decline. Where it does arise, however, relief should be denied in case of unilateral impalpable mistake, and granted where the mistake is palpable. Under this rule protection will be afforded the expectation of the promisee in accordance with the established doctrine of the courts of law and equity."

In the case at hand, PHI argues that its mistake was palpable and should have been known to the defendant AP&L not only through a comparison of its bid with the other bids submitted, but also from a comparison of its bid with AP&L's own *a priori* idea or estimate of the cost of the project. Messrs. Grimes and Walker refer to this approach:

"The second fact pattern which can be utilized to determine the objective knowledge of an offeree compares the accepted bid with the prices or estimates prepared by or for the offeree. The offeree may have used such prices

or estimates in the compilation of his own bid or in the evaluation of other bids received. He would prepare such estimates, or cause them to be prepared, if he were bidding for the prime contract and anticipated requesting certain sub-bids for specific parts of it. In certain other cases, particularly when operating within a governmental budgetary framework, he would also have such estimates prepared. The offeree will, therefore, have had some expectation of the range within which prices would fall."

In this case the defendant AP&L argues, *inter alia,* that rescission will not be permitted if it is not possible for it, the offeree, to be placed *in status quo ante.* Messrs. Grimes and Walker discuss this contention:

"The other defense is that, by reason of either partial or substantial performance by the offeror prior to its discovery of its unilateral error, the status quo has been irreparably affected and relief is thereby precluded.

"The Supreme Judicial Court of Massachusetts had the opportunity to review and rule upon both of these considerations in the case of Long v. Inhabitants of Athol. This case concerned the efforts of a contractor-plaintiff to be relieved from the obligation of a contract which was awarded by the defendant on the basis of a bid submitted by the plaintiff. This bid was in error by reason of a misdescription of quantities of materials in the job specifications. The misdescription caused an underestimate of the work to be performed.

"The defendant town argued that rescission could not be granted because it could not be placed *in statu quo.* A master found that:

" '[Plaintiffs] could not by rescinding their contract place the defendants in the same condition that they were in before the beginning of the work, or in other words, could not undo the work of construction, so

far as it had been done, and reclaim the materials furnished and labor performed.'

"This, held the Supreme Judicial Court, is far from being an unqualified finding that the defendant cannot be put *in statu quo.* The court stated: 'If the contract is rescinded and the defendants are held to pay the plaintiff for the fair value of the materials and labor furnished by the latter, and no more, we do not see why the defendants are not in a legal sense put *in statu quo.*' "

\* \* \* \* \* \*

"It is submitted that the position of the Supreme Judicial Court is proper and that neither status quo nor loss of favorable advantage or increased cost should be bars to rescission in a unilateral mistake case. It is one thing to find that the defendant did not know and should not have known that an error was made, and thereby deny relief: it is quite another, however, to find that knowledge does exist, but to deny relief on the basis of either status quo or loss of an advantage."

The authors then discuss other defenses frequently interposed, more particularly, the failure, "negligent or otherwise", of the offeree to discover his error before performance, and laches:

"A third defense sometimes raised in these unilateral mistake cases is concerned with the failure, negligent or otherwise, of the offeror, whose bid was in error, to discover his error before performance. The Restatement of Contracts, Section 508 recites: '[T]he negligent failure of a party to know or to discover the facts, as to which both parties are under a mistake does not preclude rescission or reformation on account thereof.' Language to the same effect can be found in Corbin. This position is reasonable in view of the fact that the basis of the right of action to rescind depends upon the defendant's knowledge that an error was made and the genuine unawareness of the offeror of his er-

ror at least until his bid has been accepted and, more often, until his costs rise above what he anticipated and he attempts to discover the reasons for this fact.

"This is not to say that a delay by the plaintiff in notifying the defendant after the error has been discovered would not be sufficient to bar relief on the basis of laches. As in all instances when this defense is interposed, it is a question of fact. It is to be recalled that the mere fact that substantial performance has taken place is not itself enough to constitute laches. The evidence must show, and the court must find facts indicating, first, a delay in the prompt assertion of rights and, second, a delay that works a disadvantage to the acceptor. This delay in the 'prompt assertion of rights' must be measured from the date on which the error was first discovered, not when the error was committed."

The defendant earnestly contends that the law of Arkansas controls the disposition of the legal questions in this proceeding and that the courts of Arkansas have not gone as far as the courts in certain other jurisdictions and certainly not as far as the authors of the three law review articles, just discussed, suggest.

The Court of Appeals for this circuit, in the case of Centex Construction Co. v. James, 374 F.2d 921 (1967), and Judge Henley, in the trial court's decision of the same case, 255 F.Supp. 508 (1966), have given us the most recent comprehensive review of the Arkansas law in this area. Many of the facts of that case are very similar to those found here.

The *James* case was a suit in equity for rescission of a contract arising out of an agreement for the construction of certain sanitary and storm sewers in a residential subdivision of the City of New Orleans, Louisiana. In August, 1963 the plaintiff, Worth James Construction Company, an Arkansas enterprise, was invited to submit a subcontract for such work in accordance with the plans and specifications prepared by the engineering firm of Adloe Orr, Jr. and Associates and in accordance with the specifications and requirements of the Sewerage and Water Board of the City of New Orleans. Worth James made a one-day trip to New Orleans during which he examined the job site and observed certain storm and sanitary sewer work being done by another contractor nearby. The plaintiff submitted the low bid which, after adjustments, amounted to $431,861.81. The other bids were:

| | |
|---|---|
| Navajo Constructors, Houston, Texas | $773,432.75 |
| Walter Villere Co. and Drennen Construction Co., New Orleans, Louisiana | 569,439.30 |
| Pratt Farnsworth, Inc., New Orleans, Louisiana | 547,654.00 |
| Boh Brothers Construction Co., New Orleans, Louisiana | 532,334.50 |

In October, 1963, plaintiff commenced the work. Apparently at this very early stage the plaintiff learned for the first time that the specifications for sewer manholes and the laying of pipe at certain depths were somewhat more rigorous than the ones set forth in the set of specifications furnished it by the Sewerage and Water Board. According to the Court's findings, however, this was not a serious mistake in and of itself. However, in November the plaintiff further discovered that it would have to excavate, on the average, more than two feet deeper than expected and that it would not be paid for this extra excavation. When it learned of this fact, it refused to continue and filed a suit for rescission. When Centex found that the plaintiff was not going to perform, it solicited new bids and the work was relet to Farnsworth, one of the original bidders, at a price of $99,372.19 in excess of the plaintiff's basic contract price. Centex counterclaimed for this excess against the plaintiff and the plaintiff's surety.

Judge Henley summarizes the legal contentions and theories of the parties as follows:

"Ignoring certain allegations of plaintiff's pleadings which were not relied upon ultimately, it is the theory of the plaintiff that he was induced by Centex to submit a grossly inadequate bid; that the contract into which he entered but did not perform was the result of a non-negligent mistake on his part, induced by Centex, and that he is entitled to rescission.

"The position of Centex is that the contract was not the result of any mistake, negligent or otherwise, on the part of plaintiff, and that plaintiff simply refused to perform his obligations when he found that it would not be profitable for him to do so. Alternatively, Centex says that if plaintiff made any mistake when he submitted his bid, the mistake was negligent, and that in any event the mistake, whether negligent or non-negligent, was not induced or brought about by any words or conduct on the part of Centex."

Then Judge Henley turned to a general discussion of the Arkansas law:

"Counsel on both sides are familiar and do not seem to quarrel with this Court's views as to the contract rescission on account of unilateral mistake expressed in Standard Accident Insurance Co. v. Williams, E.D.Ark., 214 F.Supp. 53, 61–62. It was there said:

" 'It is settled that a court of equity will in certain circumstances grant rescission of a · contract entered into as a result of a unilateral mistake of one of the parties, where that mistake has been produced by the conduct of the other party and where the parties can be put in status quo.

" 'The general rule is stated as follows in an Annotation appearing in 59 A.L.R. 809:

" ' "Equitable relief from a mutual mistake is frequently given by a reformation of the contract. But a contract will not be reformed for a unilateral mistake. Equitable relief may, however, be given from a unilateral mistake by a rescission of the contract. Essential conditions to such relief are: (1) The mistake must be of so grave a consequence that to enforce the contract as actually made would be unconscionable. (2) The matter as to which the mistake was made must relate to a material feature of the contract. (3) Generally the mistake must have occurred notwithstanding the exercise of ordinary diligence by the party making the mistake. (4) It must be possible to give relief by way of rescission without serious prejudice to the other party except the loss of his bargain. In other words, it must be possible to put him in status quo."

" 'In 17 C.J.S. Contracts, § 143, p. 495, it is said:

" ' "Ordinarily, a unilateral mistake affords no ground for avoiding a contract, although it may do so where it results in a complete difference in subject matter so to preclude the existence of consideration, or where it is caused by, or known, to the other party." '

"And, while the mistake must have been caused by the other party, the conduct which produces the mistake need not be in itself fraudulent or inequitable. See Annotation, 59 A.L.R. 809, 817–818, and cases there cited including Hubbert v. Fagan, 99 Ark. 480, 138 S.W. 1001.

" 'In Frazer v. State Bank of Decatur, 101 Ark. 135, 141 S.W. 941, there was a unilateral mistake on the part of plaintiff in accepting a certain instrument as a renewal of an earlier obligation, which mistake was caused by the action of agents of the defendant in failing to disclose that they had made a material alteration in the renewal instrument before executing it and delivering it

to plaintiff. Plaintiff sued at law on the original undertaking and was permitted to prevail. The Supreme Court of Arkansas after pointing out that a contract cannot be reformed on account of a unilateral mistake went on to say (p. 141 of 101 Ark., p. 943 of 141 S.W.):

" ' ". . . But a different question is presented where one of the parties to a contract seeks to have it rescinded because of a mistake on his part, for that makes only a case of there being no contract between the parties on account of the fact that there has not been a meeting of the minds of the contracting parties. . . ." '

" 'Frazer, supra, was cited with approval in Fleischer v. McGehee, 111 Ark. 626, 163 S.W. 169. In Fleischer appellant purchased lands belonging to appellee under the mistaken belief that he was purchasing adjoining lands belonging to a third person. While fraudulent misrepresentations on the part of appellee were alleged, they were not proven. Rescission was allowed, the Court pointing out that the mistake of appellant was not due to negligence, and that the status quo could be restored by a reconveyance of the lands. Both the Frazer case and the Fleischer case were cited in Murphy v. Steel, 169 Ark. 299, 274 S.W. 6, wherein rescission was granted on account of a unilateral mistake in the last description appearing in a deed.

" 'Although this is not a suit for rescission as such, the Court is convinced that the principles and authorities above stated and cited are applicable and support the result here reached.

" 'As has been shown, the policy in suit was issued as the result of a mistake on the part of McDonald going to the substance of the contract. This mistake was not due to negligence on the part of McDonald but was due to Wilmans' failure to make disclosures which he should have made, and the status quo can be restored by plaintiff's returning the premium paid by Mr. Wilmans. It is true that Wilmans will lose the benefit of his insurance protection, but that loss is due to his own failure to make disclosure, and it is but just that he should bear that loss. American Laundry Machinery Co. v. Whitlow, 198 Ark. 175, 127 S.W.2d 817.' "

Then the District Judge discusses the law with respect to those cases where the unilateral mistake was not caused by the party against whom rescission was being sought:

"Even if not caused by the party against whom rescission is sought, a unilateral mistake of fact may be ground for rescission, provided that the mistake is non-negligent, is known to such party, or is so gross or palpable that he is chargeable with knowledge of it. In such circumstances it would be unconscionable to hold the mistaken party to his undertaking, and the attempt of the other party to take advantage of the mistake may be considered a species of fraud. See 17 C.J.S. Contracts § 143, pp. 892–893; Reynolds v. Texarkana Construction Co., 237 Ark. 583, 374 S.W.2d 818; Hubbart v. Fagan, supra. In this connection in Hubbart, the Court said (p. 486 of 99 Ark., p. 1002 of 138 S. W.):

" ' ". . . 'Where relief is given because of the mistake of one party alone, it is where it is induced by the conduct of the other party, or because the other seeks unconscionably to take advantage of it, and the ground of jurisdiction is really fraud.' 16 Cyc. 69. See Rector v. Collins, 46 Ark. [167] 176, quoting 2 Pom.Eq.Jur. § 843. . . ." ' "

Judge Henley found that the James bid and the contract entered as a result thereof "were the result of a gross mistake on the part of the plaintiff as to

the depths of the ditches which he would be required to dig and as to the basis of the payments to be made to him for such excavation". The court also found that the plaintiff was mistaken with respect to the Board's specifications, mentioned above, but it did not consider that mistake to have been of great magnitude or that "standing alone it would have prompted plaintiff to refuse to perform his contract, or that it would have justified rescission". Judge Henley found further that when Centex entered into the contract, it knew that Worth James had made a serious mistake and also knew or should have known the nature of that mistake. The difficult question which the trial court faced was whether the Worth James mistake was non-negligent and whether the mistake was induced or caused by acts or representations of Centex. After a thorough analysis of the evidence, the court concluded that the mistake was non-negligent and, further, that Centex "knew when it compared plaintiffs bid with the other bids that he had made a mistake", and that the James bid was "entirely out of line with the other bids", and that Centex "could not have failed to realize that plaintiff must have based his bid on" a false assumption as to the depths to be excavated. The court concluded that, "in legal and equitable contemplation the mistake of the plaintiff was induced by Centex" in furnishing James with bidding documents that were misleading. Judge Henley concluded his opinion as follows:

". . . The Court does not know that Centex had any intention of defrauding plaintiff or of misleading him, but what was done had a natural tendency to mislead and did mislead. One can induce a person to act by silence as well as by spoken words or operative acts. It would have been easy for Centex to have told plaintiff that he should take into consideration the fact that he would have to dig from a ground surface about two feet above the curb line, and that the depths with respect to which pay-

ments would be made would be calculated from the curb line and not from the ground line. In common fairness Centex should have given plaintiff that information in advance and not left it to him to discover for himself, or should have permitted him to withdraw his bid or to rebid when it appeared that a serious mistake had been made.

\* \* \* \* \* \*

"The Court is persuaded . . . that plaintiff was led by defendant into an honest, non-negligent mistake, and that defendant should not be permitted to enrich itself unjustly at the expense of plaintiff, which would be the result of denying rescission.

"Rescission will be granted, and defendant's counterclaim will be dismissed."

It is important to note both the factual similarities and dissimilarities between the *James* case and the case in controversy.

First, both cases involved fairly large projects contemplating excavation work and some subsurface work. The bidding patterns in both cases are remarkably similar. Upon analysis it also appears that the nature of the "mistake" in each of the two cases are quite similar and that such mistakes were in part occasioned by somewhat similar circumstances. Judge Henley describes the mistaken "assumptions" relied upon by the Worth James Company:

"The drawings which were before plaintiff did not show any ground profile line, but they did show a profile line designated as the proposed 'curb line' profile. The drawings also showed vertical distances from the proposed curb line to the bottom of the trenches which were to be dug for the laying of the pipe.

"With those materials before him plaintiff proceeded to make two assumptions in preparing and submitting his bid. He first assumed that the depths appearing in the Schedule of Bid Price were from ground level

to the bottom of the trenches. He then assumed that the profile of the proposed curb line was essentially the same as a ground line profile. In making the latter assumption plaintiff may have been influenced by his knowledge that the ground in and around New Orleans is generally flat.

"Both of those assumptions turned out to be wrong. . . ."

Both in the *James* case and in the case at bar, the contractors' representatives visited the construction site and inspected same prior to submitting their bids. Mr. Valentin, indeed, flew over the terrain and drove over it. In the *James* case Worth James made a one-day trip to New Orleans and examined the job site and, in fact, observed certain storm and sanitary sewer work being performed by another contractor in a nearby area. Judge Henley took note of this in the following comment:

"It is possible, of course, that had plaintiff spent more time at the job site and had he made more detailed inquiries before his return to Little Rock, he would have learned what his local competitors already knew and would have governed himself accordingly."

In both cases the representatives of the bidding contractor failed to take note of, or adequately appreciate, the effects of local terrain conditions. In each case this failure led to false assumptions which translated themselves into gross bidding errors. This is not to say the mistakes in the two cases are in all respects the same. But they clearly do have some similar components. The errors in the two cases were not ones based on mathematical miscalculations, and both errors had a "judgmental" component.

In finding that Centex knew that Worth James had made a mistake, Judge

Henley noted that the James bid "was entirely out of line with the other bids" and that Centex "could not have failed to realize that plaintiff must have based his bid on" a false assumption. This is also true here.

■ Without going into any further analysis of the Arkansas cases, it is quite clear to the Court that plaintiff would be entitled to recover on its "first claim" were it not for the Court's finding and conclusion, *see supra*, that PHI's mistake was caused and occasioned by the negligence of PHI's estimators and particularly Mr. Valentin. And, although the Court is convinced that the better view and, indeed, the direction of the law in the nation as a whole is otherwise, it nevertheless concludes that the negligence of the plaintiff would be fatal to plaintiff's "first claim" if this was being considered by the Supreme Court of the State of Arkansas.[3] One has only to look at the Arkansas cases cited by Judge Henley in the *James* case and also at the rationale of Judge Henley's opinion itself to confirm this opinion. Indeed, one of the critical "difficult questions" faced by Judge Henley was the determination "whether plaintiff's mistake was non-negligent". And such was the view of Arkansas law which was accepted by the Eighth Circuit Court of Appeals in the appeal of the *James* case when it stated:

"The pivotal issue surrounds appellee's assumption that they [the curb line and the ground line] were the same: Was it his negligence or was he reasonably justified in light of appellant's conduct to make his bid accordingly?"

And that has been a difficult question for this Court to resolve here, too. Although the Court agrees with plaintiff that the cause of the mistake, and whether it is negligent or non-negligent,

3. It is true that there is some dicta in certain Arkansas cases that suggest, inferentially and in abstract, that negligence might not bar plaintiff's claim. *See, e. g.*, Lowell Perkins Agency v. Jacobs, 250 Ark. 952, 469 S.W.2d 89 (1971). But no Arkansas case takes exception with the *James* rationale and the Court is convinced that its reasoning would control under the facts here.

in the context of the Court's other findings and conclusions, *should be* irrelevant, it cannot "blink" the clear position taken by the Arkansas courts; nor can it fairly find or conclude that the cause of PHI's mistake here was non-negligent even though that mixed question of fact and law is not nearly as easily resolved as suggested by the defendant.[4]

 With respect to PHI's and Aetna's "second claim" AP&L strongly urges that it had a legal right to terminate the contract under Article 27 of the agreement. It points out that a power to terminate in case of unsatisfactory performance may be expressly reserved without invalidating the contract, "whether the satisfactoriness is to be determined by a party to the contract, by its engineer, or by a stranger", citing 6 Corbin, Contracts, § 266, p. 62, and, of course, this is a correct statement of the law. However, the exercise of such a drastic power must be in good faith, and the Court has concluded here that AP&L's decision to terminate was not made in good faith or for the reasons stated.

AP&L also contends that, even if it were itself in partial breach of the contract in late November, 1964, it would still have the right to terminate under Article 27. This would be so if the conditions precedent for the exercise of such power of termination had actually existed and if the termination power had been exercised in good faith. Neither such circumstance obtained here.

 AP&L also argues, apparently independent of the provisions of Article 27, that it was entitled to terminate the contract because PHI had "totally breached" the contract. Corbin defines such a "total breach" as a "non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." The total breaches, according to AP&L, consisted of such a failure of performance by PHI "as to conclusively establish that the transmission line in question could not be operable by the summer of 1965", and by PHI's conduct "in refusing further performance of the contract unless sums in excess of one million dollars were paid by AP&L to PHI and by actually cutting back its activities during a time when more work has been promised". (AP&L's Posttrial Brief, p. 68.) However, the premises for its argument are missing: the evidence does not establish that the transmission line could not have been completed so as to be operable by the summer of 1965 nor does that evidence establish that PHI refused further performance of the contract. The Court need not decide whether the conditions were such in July and August, 1964, to justify a good faith termination by AP&L under Article 27 or otherwise, for it is clear that it waived any rights it may then have had in that respect by going forward and accepting the later, much improved performance of PHI from August into November.

AP&L argues that it had no alternative, after receiving PHI's threatening letter of November 16, 1964, but to terminate. But this is not so. It could have negotiated an adjustment in the contract rate based upon PHI's bidding error and the obvious facts of the case then obtaining—a course which, in the light of this Court's decision on the

---

4. There is an ancillary question relating to the effect of the Court's conclusion that PHI was negligent in preparing its bid: AP&L contends that if the mistake made by PHI was caused by the negligence of its own employees, AP&L should be entitled to recover the costs of the completion of the project on the theory that such costs were the proximate result of PHI's negligence. If the Court had concluded that the plaintiff and Aetna were entitled to recover on the "first claim", then it would have to deal with this contention. If it had to so deal with the problem, it would have reached the obvious conclusion that AP&L could not recover on such a negligence theory because of its own inequitable conduct. In view of the conclusion actually reached by the Court with respect to PHI's and Aetna's "first claim", the negligence argument by AP&L is simply irrelevant.

"first claim", *supra*, it was not legally obligated to take; or it could have stood on its rights and flatly refused any adjustment while at the same time insisting upon full and expeditious performance of the contract by PHI. This latter position could have been taken promptly upon receipt of PHI's November 16, 1964, letter, and the next move would then have been up to PHI. One cannot predict with certainty what course PHI would have followed in such event, but it is quite clear that it wanted to complete the project. More probably than not it would have chosen to go forward hoping ultimately to be vindicated on its "first claim" theory and also expecting AP&L to fall into substantial contractual defaults as it, PHI, pressed forward with the work. Also reinforcing this alternative is the fact that even in late November, 1964, PHI did not fully understand the dimensions of its mistakes, or appreciate the significance or the consequences thereof. Of course, PHI might, on the other hand, have decided to simply walk off the job and stand on its "first claim" rights. In such event AP&L would have been within its own rights in bringing in another contractor to finish the work. So, at the very least, AP&L acted prematurely when it attempted to terminate the agreement before the conditions developed which, under that agreement, would have permitted such drastic action.

Plaintiff and Aetna seek judgments against the defendant for the fair value of the materials and services provided by PHI which they claim to be represented by PHI's actual costs of $3,054,166.82, less the amount actually paid by the defendant, to wit, $628,428.-16. The defendant strongly contends that the plaintiff and Aetna are entitled to no monetary relief. If, however, the plaintiff and Aetna are entitled to a money judgment, defendant contends that such relief should be limited by the contract rate.

An excellent statement of the law that controls in this situation will be found in City of Philadelphia v. Tripple, 230 Pa. 480, 79 A. 703 (1911). Because the rationale of that case is so important, the Court will quote from it at length. In the *Tripple* case, one George Dietrich entered into a contract with the City of Philadelphia for the construction of foundations and a superstructure for an engine house and a boiler house. Thereafter, Dietrich entered into a subcontract with one John McMenamy for excavation, pipe laying for several conduits, and an intake chamber and gate chamber. The subcontract provided that McMenamy's work was to be completed within 125 days from February 16, 1903. In the course of the performance of the work it was found that the foundation wall of the engine house grew thicker as it descended making it impossible to excavate through the use of ordinary methods without tearing down the engine house wall. About the same time this was discovered, water from the Delaware River rushed into the middle of the excavation because of a defect in the pumping station. This influx of water was not the result of any fault on the part of McMenamy. Thereupon a consultation was held and the plans changed so as to take the gate chamber away from the engine house. The work then continued. In pursuing the work, however, great difficulty was encountered in keeping the trench clear from water and, as a consequence, the progress of the work from April until October was exceedingly slow. During this time the city engineers were endeavoring to locate the leak. The referee's factual findings continue:

"The period of 125 working days specified in the contract of February 16, 1903, expired on or about July 14, 1903. No action was taken by Dietrich in view of the noncompletion of the work at that time, and McMenamy continued work under his contract with the knowledge and acquiescence of Dietrich. As time went on, however, Dietrich became more and more dissatisfied with the rate of progress, and early in October, 1905, a meeting to consider the situation was held on

the ground; those present being Dietrich, McMenamy, and their respective counsel. Dietrich complained that McMenamy was not able to cope with the water problem, and McMenamy complained that Dietrich had been derelict, in not furnishing the pumps required by the contract.

"On October 15, 1903, Dietrich wrote to McMenamy a letter in which he said: 'Inasmuch as you have failed to complete the construction of conduit at Lardners Point Pumping Station, Philadelphia, within the time and in accordance with the other requirements of your contract made with me February 16, 1903, you will please discontinue further work on the conduit and remove all your men, tools, machinery and materials therefrom within five days from this date.'

"On October 16, 1903, McMenamy wrote to Dietrich: 'I will obey your notice and will at once commence and will within the time designated finish the work of removal which you demand. I wish to say, however, that you have no foundation for complaint at the noncompletion of the construction of the Lardners Point Pumping Station conduit. You have already been told, both in writing and by word of mouth, of the particulars of which you have failed to carry out your contract. In addition to this many of the changes which have been made and the things which have been done have interfered with the completion. I will obey your notice, therefore, without acquiescing in your suggestion about my having failed in anything. I will bring a suit against you to recover the amount of my expenditures which I have already made and the damages which will result to me from your improper canceling of my contract.'

"After writing the above letter of October 16th, McMenamy did in fact discontinue further work under the contract and removed his men, tools, machinery, and materials from the ground.

"McMenamy was not in fact in default in the performance of his contract at the date of Dietrich's notice to quit.

"The actual cost to McMenamy of labor and material to the date of the receipt of Dietrich's notice to quit was $24,461.89. He received from Dietrich, as the work progressed $9,000, on account of the contract price."

The referee then made certain pertinent "findings of law" as follows:

"The failure of McMenamy to perform his contract within the time specified therein gave to Dietrich a right to treat McMenamy as in default at the expiration of the period of 125 working days, from February 16, 1903. Dietrich's conduct after the expiration of the specified period amounted to a waiver of his right to enforce the time limit. As McMenamy thereafter, with Dietrich's knowledge, spent time and money in doing work under the contract, Dietrich is equitably estopped from setting up the failure to complete within the specified time as a defense to the present suit.

"As McMenamy was not in default in the performance of his contract on October 15, 1903, the legal effect of the letter written to him on that date by Dietrich was to discharge McMenamy from further obligation to perform his contract and to waive a tender of further performance.

"Nothing in the contract between McMenamy and Dietrich justified the position taken by Dietrich in his letter of October 15, 1903.

"In virtue of his discharge by Dietrich from the obligation of further performance, McMenamy acquired the right to bring an action against Dietrich for the breach of contract, or to treat the contract as rescinded by the action of Dietrich, and to bring an action to recover the amount theretofore expended by McMenamy for labor and materials, less a proper credit for sums paid on account of the contract

price. McMenamy, in fact, elected to stand on the second of these two rights. This circumstance that Mc-Menamy, had he been permitted to complete his contract, would necessarily have expended (if we are to judge by the subsequent experience of Dietrich) a sum largely in excess of the contract price, is not a circumstance that deprives him of his right to recover the actual cost of labor and material incurred by him."

The referee then followed with his "opinion" which deals so ably with the issues with which the Court is concerned in the instant case:

"The only question of law which seems to the referee to call for a more extended comment is the question of the right of McMenamy to recover his disbursements for labor and material in a case where it seems reasonable to infer that full performance by Mc-Menamy would have involved an expenditure by him of sums in excess of the contract price. It may be remarked in passing that the large expenditures made by Dietrich when he undertook to complete the work begun by McMenamy do undoubtedly suggest the inference that McMenamy would have completed at a loss, although it is of course not a necessary conclusion of fact or of law that this would have been the case.

"Even, however, if it be assumed that McMenamy, if allowed to complete his work, would have lost money in so doing, the referee is of opinion that the act of the defendant Dietrich, in discharging the plaintiff from further obligation to perform, gave rise to a right on the part of the plaintiff to recover for his disbursements. Let it be assumed that, in an extreme case, a builder has actually expended in the course of his work a sum in excess of the contract price and has not yet completed performance. If, under such circumstances, the builder finishes his work, the owner, upon paying the contract price, will receive the benefit of a large expenditure actually made, in return for the payment of a smaller sum of money. This result, which may well involve a hardship upon the builder, is made necessary by a proper regard for the contractual rights of the owner. The owner has made a valid contract, and this contract must be protected and enforced, even if the builder suffers.

"Let it further be supposed, however, that the owner, who finds himself in this position of advantage, voluntarily puts an end to his contract rights in the premises. This in legal effect he does if he himself breaks the contract or discharges the builder from his obligation to perform it. The situation which then presents itself is one in which the builder has in good faith expended money in the course of work done for the benefit of the owner, and has, in the absence of contract, an equitable claim to be reimbursed. The owner, on the other hand, has deprived himself of the legal right which would have sufficed to defeat the equity. He accordingly stands defenseless in the presence of the builder's claim.

"Such, it is submitted, is the legal analysis of the situation in which the parties to this action find themselves. It may, of course, be contended that Dietrich did not receive an actual benefit coextensive with McMenamy's expenditure. It is a sufficient answer to this contention to observe that (upon the facts as heretofore found) McMenamy expended the money in good faith and in the course of attempted performance. This is sufficient to give him an equitable claim for reimbursement.

"The defendants do not dispute the general proposition that a plaintiff may, as if in the absence of contract, recover the cost of work and materials in case he is prevented by the owner from finishing his work. The defendants earnestly contend, however, that the rule meets with an exception in case the disbursements exceed the contract price. In other words, they re-

gard the difference between the price specified in the contract and the sum of the disbursements as the measure of recovery, and they insist that if the aggregate of disbursements equals or exceeds the contract price there can be no recovery at all.

"This view, as is indicated by the analysis made above, appears to the referee to involve a confusion of thought. How can the plaintiff's claim for disbursements actually made be met by the limitation contained in a contract, unless the defendant retains the right to enforce the contract? And how can it be contended that the defendant retains such a right when the contract has been discharged by his own act? It may well be that a plaintiff, upon defendant's breach, may offer the discharged contract as evidence of the value of that for which he is seeking recovery. The plaintiff in such a case has not broken the contract; he may fairly contend that its terms are at least an admission by the defendant which the jury should take into consideration. But, where the defendant undertakes to limit the plaintiff's recovery by treating the contract price as a limitation upon such recovery, he is asserting a right under the very contract which he himself has discharged. The defendants cite Brown v. Foster, 51 Pa. 165, as sustaining their contention. On examination, however, it is clear that the case does not help them. It was the case of a plaintiff, not in default, who was held to be entitled to offer the contract in evidence in an action upon the common counts. It was not the case of a defendant in default who attempted to enforce a right created by the broken contract. On the other hand, Mooney et al. v. York Iron Co., 82 Mich. 263, 46 N.W. 376, cited by the plaintiff, throws much light upon the question under consideration, for in that case the plaintiff was permitted to recover from defendant in default the fair value of labor and material which was said not to be correctly measured by their value to the defendant."

The Supreme Court of Pennsylvania affirmed the judgment "for the reasons stated in the report of the learned referee".

The case of Kass v. Todd, Mass., 284 N.E.2d 590 (1972), is also important not only because it affirms the principle enunciated in *Tripple* but also because it outlines the appropriate limitations upon that principle. The *Kass* case involved the construction of a house. During the course of the construction the contractor submitted certain bills to the owner which were due and payable under the contract within seven days. The owner did not make the payments, and the master found as a matter of law that this failure to pay was a material breach of the contract which entitled the contractor "to recover in *quantum meruit* for the fair value of the work, labor and materials supplied by him". The master concluded that the plaintiff's breach of contract justified the defendant in refusing to proceed further with the construction work. However, the contractor did in fact proceed to substantially complete the house despite plaintiff's breach. The master found the fair value of the building to be $38,385.50 and that the contractor was entitled to recover in *quantum meruit* (rather than on the contract) the balance, after deducting payments, of $15,525.58. The master states, "if the . . . [defendant] is limited to the amount due under the contract, I find that the . . . [plaintiff] is indebted to the . . . [defendant] in the sum of $6,778.41". Judgment was therefore entered in favor of the contractor in the amount of $15,525.58, with interest from the date of the breach. The trial judge accepted the master's report and entered judgment accordingly.

The Supreme Judicial Court of Massachusetts, in an opinion by Justice Spiegel, reversed the decree and ordered judgment entered in favor of the defendant in the amount of $6,778.41, that is, for the contract rate. In so doing

the Supreme Judicial Court of Massachusetts had an opportunity to delineate the scope of the *"Tripple* principle". It stated:

"The more difficult question is whether the judge applied the correct measure of damages. The amount allowed by the court ($15,525.58) was the difference between what the master found to be the fair and reasonable value of the property ($38,385.50) and the payments made by the plaintiff under the contract ($22,859.92). The plaintiff argues two points: first, that the defendant is not entitled to recover on a contract theory because he has not completely performed his obligations under the contract; second, assuming that the defendant is entitled to recover on a *quantum meruit* theory, his award may not exceed the stipulated contract price. The plaintiff primarily relies on Burke v. Coyne, 188 Mass. 401, 404, 74 N.E. 942, and Hooper v. Cuneo, 227 Mass. 37, 116 N.E. 237, for the latter proposition. The correct measure of damages on the *quantum meruit* theory, according to the plaintiff, should have been the proportion of the contract price which the work that the defendant did bears to the full amount of work for which the contract provided.

"The circumstances of the instant case are to be contrasted with those of the *Burke* and *Hooper* cases where recovery by a builder on *quantum meruit* was limited to the contract price because the builder was at fault. The law protects the 'expectation interest' of the person who has made a favorable contract and has abided by it. *See e. g.* Gillis v. Cobe, 177 Mass. 584, 600, 59 N.E. 455. Nordstrom & Woodland, Recovery by Building Contractor in Default, 20 Ohio St.L.J. 193, 214–219. Where, however, the person who has made the favorable contract has defaulted, and rescission by the other party is warranted, ordinarily recovery can be had for the fair and reasonable value of labor and materials. The party at fault should not be permitted to break the contract and yet retain the benefit of the contract by way of limiting his damages to the contract price. Bailey v. Marden, 193 Mass. 277, 279, 79 N.E. 257. Philadelphia v. Tripple, 230 Pa. 480, 488, 79 A. 703.

"The defendant, on the other hand, argues that he may recover on *quantum meruit* on the basis of a line of cases beginning with Fitzgerald v. Allen, 128 Mass. 232, 234. There it was said: 'The result of the cases is, that, if the special contract is terminated by any means other than the voluntary refusal of the plaintiff to perform the same upon his part, and the defendant has actually received benefit from the labor performed and materials furnished by the plaintiff, the value of such labor and materials may be recovered upon a count upon a *quantum meruit*, in which case the actual benefit which the defendant receives from the plaintiff is to be paid for, independently of the terms of the contract. The contract itself is at an end. Its 'stipulations are as if they had not existed.' *Accord*, Connolly v. Sullivan, 173 Mass. 1, 5, 53 N.E. 143, and Bailey v. Marden, 193 Mass. 277, 279, 79 N.E. 257. In Dalton v. American Ammonia Co., 236 Mass. 105, 108, 127 N.E. 504, 505, it was said: 'When such a contract is broken by the defendant without the plaintiff's fault, and the latter, disaffirming the contract and considering it at an end, sues for the value of the services rendered upon a *quantum meruit*, he may recover the full value of his services independent of the contract price, as if the special agreement did not exist; and the contract price is important only as bearing on the true value of the services rendered.' This appears to be consistent with the balance of judicial opinion in other jurisdictions. McCormick, Damages, § 166. Restatement: Contracts, § 347, comment c. Williston, Contracts (3d ed.) §§ 1459.

and 1485. 98 C.J.Š. Work and Labor § 66(4)(c)(b)."

Justice Spiegel then points out that the *Kass* case is readily differentiated from the cases just discussed. He notes the factual distinction and then discusses the controlling law:

". . . After the plaintiff had broken the contract, the defendant continued to perform, and, in fact, submitted bills for work completed after the breach. The master found that the amount of work remaining to be done was negligible, and that the entire balance on the contract was due. The defendant in his counterclaim alleges that he did a 'substantial portion of the . . . work,' and in his brief admits that the construction was 'substantially complete, with only extremely minor finishing and corrections to be performed.'

"The facts of the instant case closely resemble the situation facing the court in United States for Use and Benefit of Harkol, Inc. v. Americo Constr. Co. Inc., 168 F.Supp. 760, 761–762 (D.Mass.), where it was held that a subcontractor could not recover on a *quantum meruit* but was restricted to the contract price. The court there rejected the plaintiff subcontractor's theory of recovery because 'it did not abandon performance, nor did it enter into a new contract or implied contract for the fair value of its services as the price of not treating defendant's breach as total. . . . Even after the job was completed plaintiff recognized the contract, and sought payment thereunder.'

"We are of opinion that the holding in the *Americo Constr. Co.* case is sound. The defendant is limited to recovering the amount still due under the contract, plus certain extras. The master found this amount to be $6,778.41."

Here AP&L repudiated and wrongfully terminated the contract. Thereafter PHI withdrew (under protest) as or-

dered and, of course, performed no further work.

The Pennsylvania and Massachusetts rules appear to be in accord with the general rule in the United States. *See* Scaduto v. Orlando, 381 F.2d 587, 595 (2nd Cir. 1967).

██ ██ Finally, the case of United States v. Zara Contracting Co., 146 F.2d 606 (2nd Cir. 1944), decided by a panel consisting of Judge Learned Hand, Judge Chase and Judge Clark, provides additional persuasive support for PHI's contention that, under the facts of this case, it is entitled to recover on a *quantum meruit* basis for the value of the work performed. In the *Zara* case the district court found that the subcontractor was wrongfully terminated by Zåra. This became an important issue on appeal, resulting in the affirmance of the district court's ruling on this point:

". . . We find no error, therefore, in the decision that Zara wrongfully prevented plaintiffs from completing the project.

"This, of course, disposes of Zara's claim for damages and leaves for consideration the amount of recovery due the plaintiffs. In their complaint originally plaintiffs had a second count claiming an accounting of profits; but this they abandoned, and they have made no claim for damages for breach of contract. Their only claim, therefore, is for the value of the work performed and of the rental of equipment retained by Zara on the job."

The district court had refused to limit the subcontractor's recovery to the contractual rate. On appeal it argued three theories as supporting the decision of the district court in this respect. As stated by the court, the subcontractor's third argument:

". . . is that, in view of Zara's default, they may waive the contract entirely and sue in *quantum meruit* for the reasonable value of the work performed."

338

The court then disposed of the subcontractor's first two arguments, finding them unpersuasive, but went on to state:

". . . No such infirmity attaches to the third theory, however.

"For it is an accepted principle of contract law, often applied in the case of construction contracts, that the promisee upon breach has the option to forego any suit on the contract and claim only the reasonable value of his performance. This is well settled in the New York cases. Clark v. New York, 4 N.Y. 338, 53 Am.Dec. 379; Wright v. Reusens, 133 N.Y. 298, 305, 31 N.E. 215; Purdy v. Nova Scotia Midland Ry. & I. Co., 11 Misc. 406, 32 N.Y.S. 157; Simmons v. Ocean Causeway of Lawrence, Long Island, 21 App.Div. 30, 47 N.Y.S. 360; O'Dwyer v. Smith, 38 Misc. 136, 77 N.Y.S. 88; Silleck v. Robinson, 60 Misc. 481, 113 N.Y.S. 832; cf. also Majestic Tile Co. v. Nicholls, 161 Misc. 231, 291 N.Y.S. 551, 557.

"It also appears to be the general view, save for an occasional case viewed as illogical by the text writers, who are solidly in support of the doctrine. See, for example, Rodemer v. Gonder, 9 Gill, Md., 288; Connolly v. Sullivan, 173 Mass. 1, 53 N.E. 143; City of Philadelphia v. Tripple, 230 Pa. 480, 79 A. 703; Valente v. Weinberg, 80 Conn. 134, 67 A. 369, 13 L.R. A.,N.S. 448; Boomer v. Muir, Cal. App., 24 P.2d 570; Patterson, Builder's Measure of Recovery for Breach of Contract, 31 Col.L.Rev. 1286, 1300–1303; 5 Williston on Contracts, Rev. Ed., § 1485; McCormick on Damages, § 166; Woodward on Quasi-Contracts, §§ 268, 269; Restatement, Contracts, § 347; 34 Col.L.Rev. 365; 7 So.Calif. L.Rev. 338. The rule has been applied by this court. Schwasnick v. Blandin, 2 Cir., 65 F.2d 354; and cf. Knotts v. Clark Const. Co., 7 Cir., 249 F. 181, certiorari denied 246 U.S. 666, 38 S.Ct. 335, 62 L.Ed. 929.

"These authorities make it quite clear that under the better rule the contract price or the unit price per cubic yard of a construction or excavation contract does not limit recovery. This, too, is the rule in New York. Clark v. New York, supra; O'Dwyer v. Smith, supra. This doctrine is particularly applicable to unit prices in construction contracts; as Professor Patterson points out, 31 Col.L.Rev. at page 1303, a plaintiff may well have completed the hardest part of a job for which an average cost had been set. But it seems settled now in New York that with the breach fall all the other parts of the contract. Matter of Montgomery's Estate, 246 App.Div. 495, 284 N.Y.S. 5; Id., 272 N.Y. 323, 6 N.E.2d 40, 109 A.L.R. 669, affirming 248 App.Div. 809, 290 N.Y.S. 556, affirming 158 Misc. 412, 287 N.Y.S. 136; Sterling Motor Truck Co. of New York v. Schuchman, 260 N.Y. 358, 183 N.E. 524. Hence it is clear that plaintiffs are not limited to the contract prices in the situation disclosed here.

\* \* \* \* \* \*

". . . Professor Williston points out that the measure of recovery by way of restitution, though often confused with recovery on the contract, should not be measured or limited thereby; but he does point out that the contract may be important evidence of the value of the performance to the defendant, as may also the cost of the labor and materials. 5 Williston on Contracts, Rev.Ed., §§ 1482, 1483, 1485.

\* \* \* \* \* \*

"It is to be noted that, since it is the defendant who is in default, and plaintiffs' performance here is 'part of the very performance' for which the defendant had bargained, 'it is to be valued, not by the extent to which the defendant's total wealth has been increased thereby, but by the amount for which such services and materials as constituted the part performance could have been purchased from one in the plaintiff's position at the time they were rendered'. Restatement,

Contracts, § 347, comment c. *See also* City of Philadelphia v. Tripple, *supra*, 230 Pa. at page 487, 79 A. 703; Simmons v. Ocean Causeway of Lawrence, Long Island, *supra*; United States v. Behan, *supra*, 110 U.S. 338 at pages 344, 345, 4 S.Ct. 81, 28 L.Ed. 168; Patterson, *supra*, 31 Col.L.Rev. at page 1299."

The Court concludes that PHI and Aetna are entitled to recover on a *quantum meruit* basis the fair value of the work performed by PHI prior to the wrongful termination by AP&L on November 28, 1964, and further concludes that the counterclaim of AP&L must be dismissed because of the total breach of the contract occasioned by its bad faith and wrongful termination of the contract.

*Recovery*

Defendant maintains that, even if PHI and Aetna were permitted to recover on a *quantum meruit* basis, there is no evidence that the amounts actually expended by PHI represent a fair and reasonable value for the work performed. The defendant argues that the evidence disclosed that much of the actual expense incurred resulted from the inefficiencies and lack of know-how of PHI and that some of the expenditures were, moreover, directly attributable to PHI's having to go back and redo work that did not meet contract specifications. There is some merit in these contentions. Although the Court finds generally that PHI performed the contract work in accordance with plans and specifications and in a workmanlike manner, still there are exceptions to this general finding. As of the date of termination many of the past "breaches" or departures from the plans and specifications had been corrected and remedied to the satisfaction of AP&L. But, in determining the fair and reasonable value of the work performed, should not AP&L be given some credit for the cost and ex-

pense of correcting or redoing inadequate work? PHI and Aetna argue that much of the "excess" cost of which AP&L complains was the result of its own "breaches" of the express and implied terms of the agreement and of its failure to reasonably cooperate with PHI during the course of the work. Should not AP&L, the party that breached the contract, pay these actual expenses since they were caused by it, or, reasonably, should not have been required? The Court believes there is merit in both of these positions, too, but, because of its overall view of issue (*see infra*), concludes that it is unnecessary to break out these off-setting considerations. Before getting into a further analysis of the problem, it is important to first review the evidence and the contentions of the parties with respect to the actual expenditures made by PHI.

PHI and Aetna argue that the evidence is clear that they expended the sum of $3,054,166.82 on this project. AP&L contends that the proper figure would be $2,641,268.76. There is, however, not as much actual difference between the parties as these figures might indicate. First, AP&L has questioned approximately $130,000.00 of PHI's claim as not being supported by adequate documentation. Then it claims that some $82,000.00 should be credited against PHI's figure for the amount realized by PHI out of the resale of certain equipment as to which it had exercised options contained in lease-purchase agreements. Finally, AP&L challenges PHI's entitlement to "overhead" expenses, that is, general and administrative expenses, in the amount of $160,361.31. If one adds back in these three figures to the basic AP&L figure, he will find that the total exceeds three million dollars. So one can see that the argument is not so much over what was actually expended as it is over the propriety of including certain figures in the total.[5]

5. If the Court had determined that PHI was entitled to recover its actual expenditures, it would have accepted PHI's total expense figure of $3,054,166.82 as prima facie evi-

dence thereof. It would have agreed with AP&L that it should be credited with the sum of $81,739.50 which PHI made out of the resale of the equipment. And it would

In the *Zara* case, cited *supra*, the court stated that plaintiff's performance " 'is to be valued, not by the extent to which the defendant's total wealth has been increased thereby, but by the amount for which such services and materials . . . could have been purchased from one in the plaintiff's position at the time they were rendered.' Restatement, Contract, § 347, comment c." On the basis of the *Tripple* theory, the Court has rejected the actual contract rate here since same has been completely discredited as being any evidence of the reasonable value of the work performed. This is not true, however, with respect to the values placed upon such work by other bidders and particularly the next potentially acceptable bid, that of Foley-Jelco (third lowest). The Foley-Jelco bid was in the amount of $3,840,276.50, of which $2,822,471.00 was allotted to the "towers in place" or "civil" part of the work.[6] The Stovall bid figure (second lowest) for this portion of the work was $2,466,655.50 and the Commonwealth Electric bid therefor (fourth lowest) was $2,695,183.00. Indeed, the very closeness of these three bids, which average $2,661,436.50, is additional evidence of their reliability as evidence of the fair and reasonable value of the work contemplated.

PHI strongly contends that the use of other bids, even the Foley-Jelco bid, is less reliable and less equitable in ascertaining the fair value of the work than would be its actual expenditure figures. PHI points out two defects that result if one relies solely on the bid figures: (1) such approach necessarily assumes that the bid figures represented a fair valuation of the expense to AP&L *under the actual conditions of performance,* whereas the evidence reflects that PHI did not receive reasonable cooperation from AP&L and CAI and, further, that PHI's expenses were increased by the breaches of the express and implied agreement by AP&L; and (2) that the "other bid" method does not take into account that PHI was prevented by AP&L from performing the entire job and, therefore, would preclude recovery for mobilization, setup, and learning expenses necessarily incurred in the earlier portions of the work. PHI points out the language in the *Tripple* case:

> "It may, of course, be contended that Dietrich did not receive an actual benefit coextensive with McMenamy's expenditure. It is sufficient answer to this contention to observe that (upon the facts as heretofore found) McMenamy expended the money in good faith and in the course of attempted performance. This is sufficient to give him an equitable claim for reimbursement."

The Court agrees that there is no evidence of bad faith or extravagance on the part of PHI in its attempt to perform the work under the contract, but, for the reasons stated below, it still feels that the bid figures provide good and competent evidence for the determination of the fair value of the work performed by PHI.[7]

---

have agreed with PHI that it was entitled to include the overhead figure for general and administrative expenses in the amount of $160,361.31. Concluding that the burden of proof would be upon AP&L to challenge specific expenditures by PHI, it would have found that AP&L failed to carry this burden with respect to the other challenges it made upon the actual expenditure figures of PHI. The resulting figure—$2,972,427.32—would also have been the amount of the combined judgment for PHI and Aetna had they prevailed on their "first claim" since the emphasis there would be more on making the injured party whole and making the party that had the opportunity and reason to avoid the fiasco pay the cost occasioned by its decision not to do so.

6. In analyzing and comparing bids it is important to keep in mind that they were based upon "unit" prices. Actual quantities required would have to be ascertained to make the total bid figure truly comparable. For instance, AP&L's proof was that, had PHI fully performed, it would have earned *under the contract* $3,143,309.77, based upon actual quantities, which, it will be noted, is over $400,000.00 in excess of PHI's bid figure.

7. Plaintiff calculates that PHI would have earned, under the Foley-Jelco bid, for the

AP&L contends that neither the actual expenditures by PHI or the values represented by the bids provide the best evidence of the fair and reasonable value of the work performed by PHI. It insists that the best evidence thereof will be found in the "Rosenbaum estimates" which were prepared by an officer of PHI. The Court finds, however, that the Rosenbaum estimates were prepared before adequate information was available and are in fact erroneous. Further, it does not agree with AP&L that PHI is bound by such estimates or "estopped" to claim more than the amounts set forth in such estimates.

Even if one uses the bid figures, AP&L urges that the percentage completion figures found by the Court are in error and that same completely ignore the size, cost and difficulty of the installation of the foundations constructed after termination in comparison with those constructed before termination, and that the use of such percentages would also give PHI credit for the completion of a proportionate part of the cost of erecting certain "F", "E" and "E" towers, none of which were erected by PHI and all of which are more expensive than the "A" towers.[8] Further, AP&L argues that such calculations would ignore the amount of work left to be done on towers which had not been "back bolted".

The Court is of the opinion, and finds, that there is some merit in both the contentions of PHI and of AP&L with respect to the shortcomings of using the other bids, but, again, it finds that such effects do not negate the competence, value or usefulness of such evidence. This may not be an adequate answer to PHI's argument that AP&L, having wrongfully and in bad faith terminated the contract, should not be permitted to complain for having to reimburse PHI for its actual expenditures. Nevertheless, the Court is convinced that the proper method for determining the fair and reasonable value of the work performed in this case requires it to take into consideration *all* competent evidence bearing upon that issue, and this includes evidence of the actual expenditures of PHI as well as evidence of the second, third and fourth bid figures, together with the evidence relating to the many countervailing considerations, some of which are discussed above. This is an extremely difficult and complicated case. No *one* standard of fair value leads to as just a solution as does a proper consideration of all of the factors involved.

Upon the basis of all the evidence in the case and taking into consideration the contentions and arguments of the parties, the Court finds that the fair and reasonable value of the work and

work actually performed by it, slightly less than two million dollars (as compared to its actual expenditures of $3,054,166.82). Viewing the matter differently and making adjustments for what it contends was partially completed work, AP&L arrives at a figure of approximately $1,700,000.00 for the work actually done by PHI when calculated on the basis of the Foley-Jelco bid.

Plaintiff has pointed out that the statement, "Plaintiff calculates that PHI would have earned, under the Foley-Jelco bid, for the work actually performed by it, slightly less than two million dollars (as compared to its actual expenditures of $3,054,166.82)", is somewhat misleading when the figure calculated by plaintiff of "slightly less than two million dollars" was determined by allowing a credit for payments received in the amount of $628,427.66. Plaintiff is correct in that the statement is somewhat misleading in

that plaintiff's calculation of the total earnings that it would be entitled to when applying the Foley-Jelco bid amounted to $2,619,844.75. At plaintiff's request this correction is made in order to clarify the matter.

8. AP&L argues that the completion figure for foundations should be corrected to 42 per cent to reflect actual types and costs of the foundations completed rather than simply the number thereof. The Court agrees that the degree of completion should not be measured solely but the number of foundations and towers installed, but it disagrees with AP&L with respect to its analysis of the effect of such other considerations. The Court has taken all factors into consideration in reaching its determination of the degree of completion and the fair value of the work.

services actually performed by PHI is $2,125,000.00 of which $628,427.66 has been paid by AP&L, leaving a balance of $1,496,572.34.[9] Judgment will therefore be entered in favor of Aetna in the amount of $610,126.71, and in favor of PHI in the amount of $886,445.63.

■■■ The question of interest is complicated in this case. The law in Arkansas generally recognizes that even in cases of unliquidated damages interest should be allowed where compensation is the basic principle of recovery and where that compensation can be measured by market value or other definite standards. *See* Kennedy v. Clayton, 216 Ark. 851, 860–871, 227 S.W.2d 934 (1950). However, there is dicta in Loomis v. Loomis, 221 Ark. 743, 255 S. W.2d 671, that the reason for not allowing unliquidated damages is that the "extent of . . . liability can be determined only by liquidation, as in a suit for personal injuries or for recovery upon *quantum meruit*". Despite such language and despite the inconsistency of certain of the Arkansas decisions, the Court is convinced that the law of Arkansas would require the payment of interest in cases such as this on the theory that it is an essential element of the relief to which the plaintiff is entitled. Corbin suggests that the measure of such relief is the reasonable value of the goods or other property ". . . at the time when they were received by defendant". 5 Corbin, Contracts, § 1112. The defendant has had the use and benefit of the work performed by PHI since 1964. The "second claim" of plaintiff and Aetna does not involve complicated issues of fact or law. The theory of recovery is clear and straightforward and there are standards by which the fair and reasonable value of the work could have been, and can be, ascertained.

Nevertheless, under Arkansas law the date of proper demand is also very important in ascertaining the time from which interest should be paid. The pleadings of the plaintiff and Aetna with respect to the "second claim" reveal uncertainty as to the theory and measure of damages. It was not until August, 1967, that plaintiff amended its "Count II" to increase its demand from $476,572.00 to "the approximate sum of $2,171,572.00". It was not until December 23, 1970, that plaintiff filed its second amendment to increase its prayer for damages under this count to $2,409,296.00. Aetna first filed its claim against the defendant on October 7, 1965, for the sum of $603,980.00. It was increased to $610,233.00 on December 23, 1970.

■■■ The Court will allow interest to Aetna at the Arkansas "legal rate" (six per cent per annum) on the amount of $603,980.00 from October 7, 1965, and on the sum of $6,146.71 from and after December 23, 1970. The Court will allow such interest on the entire judgment in favor of PHI from and after August 2, 1967.

A precedent judgment shall be prepared by the attorneys for PHI and Aetna in accordance with this opinion and submitted to the attorneys for AP&L for approval as to form. Then same shall be forwarded to the Court for its final approval.

9. The Court has, by giving significant effect to the other bids, arrived at a fair value figure that is considerably below that which it would have found had it simply reduced the actual expenditure figure by the fair value of all legitimate offsetting factors claimed by AP&L.